STILLWATER WATER COMPANY v. HENRY C. FARMER.[1]

February 27, 1903.

Nos. 13,213—(206).

## Diversion of Water—Injury to Spring.

Except for the benefit and improvement of his own premises, or for his own beneficial use, the owner of land has no right to drain, collect, or divert percolating waters thereon, when such acts will destroy or materially injure the spring of another person, the waters of which spring are used by the general public for domestic purposes. He must not drain, collect, or divert such waters for the sole purpose of wasting them.

[1] Reported in 93 N. W. 907.

Injunction to Restrain Waste.

An action may be maintained by an injured party to restrain and prohibit such waste.

Appeal by plaintiff from an order of the district court for Washington county, Williston, J., denying a motion for a new trial. Reversed.

*J. N. Searles*, for appellant.

*J. N. Castle* and *J. C. Nethaway*, for respondent.

COLLINS, J.

This was an action brought to restrain the defendant from interfering with subsurface waters, which, percolating through the ground, served in part to supply a spring situated upon plaintiff's property, which spring the latter uses to furnish its patrons, the people of Stillwater, with water for domestic use; the plaintiff's business under its charter being to provide the city and its inhabitants with water for both fire and domestic purposes. For other than domestic purposes water is taken from McKusick Lake by plaintiff company, but it must rely upon this spring, which is quite large, and others, much smaller, for a supply for domestic use.

The action was dismissed when plaintiff rested at the trial below, upon the ground that it had failed to establish a cause of action. The case comes here upon a bill of exceptions on appeal from an order refusing to grant plaintiff's motion for a new trial.

Whatever may have been the issue tried in the court below, it is very evident, and both parties now concede, that there is but a single question here. It is a new and important one, not without difficulty of determination, and upon which there seem to be very few cases to which we may look for assistance. The plaintiff corporation owns and uses for its mains a narrow strip of land running from McKusick Lake through a ravine which finally terminates in the vicinity of Lake St. Croix. At one time this ravine was the bed of a small brook, the outlet of McKusick Lake, but a running stream no longer exists. Part way down this ravine is the spring around which the plaintiff has built a circular wall about six feet in diameter. On the south it is less than one foot

from this wall to the line of land owned by defendant, and upon the east the line is only three feet distant.

Some time ago, on his own land, near the boundary line, and about ten feet from the center of the spring, the defendant excavated a trench, into which percolating waters were drained and gathered in quantities sufficient to affect materially the supply at the spring itself. In this trench he placed a three-inch pipe, which is used to supply water for his livery barn, some distance away. This supply comes from a small spring on one side of the excavation, which defendant has walled up so that its waters do not mingle with those gathered in the bottom of the trench. Of the pipe and its use plaintiff makes no complaint. In the bottom of the trench the defendant then placed a ten-inch tile pipe, and connected it with the city sewer. By means of the trench percolating waters were and are drawn away from plaintiff's spring, where they would naturally and otherwise go, are gathered in the bottom of the trench, and are then conducted to the city sewer through the ten-inch pipe. Therefore waters naturally supplying the big spring, and used by plaintiff for the public good, are drained and diverted, and, instead of serving the wants of the people, are dissipated and lost. By this draining and diversion the waters in the spring were lowered and reduced one or two inches.

Upon discovering the effect of the ten-inch pipe upon the spring, plaintiff made some changes in the outlet through which the water ran and in its mains for its own protection and benefit, whereupon defendant commenced to relay his ten-inch pipe on a lower level, beginning at its intersection with the city sewer, and working toward the trench.

When a portion of this pipe had been relaid, and while defendant was engaged in the work, plaintiff secured a temporary injunction restraining him from further relaying upon this lower level. The defendant, according to the testimony, threatened to continue such work, and to bring the pipe into the trench, so that when it connects with the water it will be at least eighteen inches below the outlet of the main used by plaintiff to secure its supply from this spring. The effect is evident, and the court below found

that, if the connection is made, as intended, there will be imminent danger that so large a portion of the waters, which now naturally flow into, and, in the absence of the trench, would continue to percolate and collect in, the plaintiff's spring, will be diverted therefrom, and drained into the trench, from thence through the pipe and into the city sewer, that plaintiff's water supply will be thereby diminished to such an extent as wholly to incapacitate and prevent it from furnishing the city and its inhabitants with sufficient water for domestic use, as it is obliged to do under its contract with the city, the result being to deprive the people of wholesome water, to destroy the plaintiff's business, and to render its plant valueless. Stated in a few words, the plaintiff, engaged in supplying the people of Stillwater with spring water for domestic purposes, is seeking to prevent the defendant from digging a trench so close to its own means of supply as to divert and drain percolating waters, to ruin that supply, and to deprive the people of pure water for domestic uses, for the sole purpose, so far as appears in this case, of wasting these waters into a city sewer.

The question in this case, reduced to its last analysis, involves the defendant's right to collect by drainage these fugitive subsurface waters, and then to waste them, to the annihilation of plaintiff's business, and to the great discomfort and injury of the people who depend upon the plaintiff for water for domestic use. The books are full of cases in which the rights of an owner of the soil to collect and control percolating waters are considered and determined. A brief and comprehensive general statement of the law pertaining to the subject is found in Pixley v. Clark, 35 N. Y. 520, 527, where it is said: "An owner of the soil may divert percolating water, consume or cut it off, with impunity. It is the same as land, and cannot be distinguished in law from land. So the owner of the land is the absolute owner of the soil and of percolating water, which is a part of, and not different from, the soil. No action lies against the owner for interfering with or destroying percolating or circulating water under the earth's surface." This doctrine, and the reasons for it, are well stated in Frazier v. Brown, 12 Oh. St. 294, 311, in the following language:

"In the absence of express contract and of positive authorized legislation, as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing, or filtrating through the earth; and this mainly from considerations of public policy: (1) Because the existence, origin, movement, and course of such waters, and the causes which govern and direct their movements, are so secret, occult, and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would be, therefore, practically impossible. (2) Because any such recognition of correlative rights would interfere, to the material detriment of the commonwealth, with drainage and agriculture, mining, the construction of highways and railroads, with sanitary regulations, building, and the general progress of improvement in works of embellishment and utility."

From this statement, which is really a synopsis of the reasons which have been given again and again for the established doctrine governing percolating waters, it is manifest that considerations of public policy have been of great and controlling weight in shaping the conclusions of the courts. Legal rules, it is said, would be involved in hopeless uncertainty, if an attempt was made to administer them in respect to such waters, and any recognition of correlative rights would interfere, to the material detriment of the state, with the general improvement of the soil. In so far as the rules laid down in the opinions from which we have quoted are applicable to a given set of facts, there is no reason why they should not be followed in this court, for they are in harmony with all that has been said in the cases heretofore before us involving the rights of landowners with respect to running streams and surface waters. Nor do they conflict in the least with the doctrine which will uphold an owner of land in diverting and disposing of percolating waters for his own beneficial use, either as a water supply for himself or others or for the improvement and drainage of his own land.

If, for illustration, the excavation had been made for any purpose useful to defendant, such as supplying his buildings with water, or as a means to drain or improve his own land, we should

have a case altogether different, on the facts, from that now before us. If the collection of these waters was essential and necessary that defendant might use them for any reasonable purpose, or, even if, from the evidence, it could be found that he was competing with the plaintiff, and proposed to use the waters for a public purpose, or if it were necessary that the natural conditions of his land should be disturbed and subsurface waters drained in order to improve it, then there would be very little doubt as to the rule to be applied, and of the correctness of the conclusion reached by the court below. But such is not the situation presented by this record. The facts are not seriously in dispute, and they have compelled defendant's counsel to take the position that their client, as owner of the soil, has an absolute and unqualified right to collect, divert, and waste these percolations, although the plaintiff, by these apparently unnecessary and capricious acts, is and will be further, to a greater extent, and almost wholly, deprived of waters heretofore appropriated and used by it to supply the people of Stillwater with a pure article for domestic purposes, and to their great injury.

The acts which the defendant has performed, which he proposes to continue, and to render more obnoxious and injurious by further and unnecessary drainage of waters which naturally make their way into plaintiff's spring, have not been and are not done for his own benefit, or for the beneficial use and enjoyment of his own property, but for some purpose not apparent from the record, and which can only be surmised. If, however, he has the legal right to perform these acts, the authorities are abundant, and seemingly unanimous, to the effect that his motive and purpose are immaterial. But we have arrived at the conclusion that, irrespective and independent of his motive, he has no absolute legal right to collect these subsurface waters solely that they may be wantonly wasted, and that he may be restrained from so doing.

It is true that this action must be disposed of upon principles involving natural rights of property, and, while we are first to look to the extent of the defendant's ownership in the land in which he has dug the trench, we are not altogether to lose sight of the fact that he has collected the water for no worthy purpose,

and that he is squandering it, to the injury of the public. Having this very situation in mind, a learned text-book writer has suggested that the maxim, "Cujus est solum, ejus est usque ad cœlum," is not strictly and absolutely applicable to all of the relations of adjoining land proprietors. "It is obvious," he says, "that neighbors cannot be mutually indifferent to each other's doings." As applicable to their relations and their acts, this author further says: "The common law, otherwise so jealous of such interference between the owner and his property, imposes upon him the simple rule, 'Sic utere tuo ut alienum non lædas.'" Angell, Water Courses (7th Ed.) par. 114. In Haldeman v. Bruckhart, 45 Pa. St. 514, 517, it was said, when commenting upon the maxim last quoted, that "confessedly the absolute dominion of a proprietor over his land to the center of the earth is restrained by [it]."

This maxim has been repeatedly recognized in this court when considering the perplexing subject of surface waters, and it has been held that they must be used and disposed of so as not unnecessarily to injure another person. And an examination of the cases in which the maxim, "Whose is the soil, his it is even to heaven and to the middle of the earth," has been applied, discloses that in nearly every one the person interrupting, collecting, and diverting percolating waters upon his own land was doing so' that he might improve and benefit it, or was himself making some beneficial use of the fugitive waters with which he was interfering. We see no reason why the maxim, "So use your own property as not to injure another," should not be applied, in a proper case, to percolating waters, or why the limitation found therein is not pertinent when reason and justice suggest the need of it, or why the doctrine of reasonable use and correlative rights should not be applicable where the owner of the soil, for no beneficial purpose to himself or to his estate, and to the positive injury of his neighbor or the public, insists upon turning pure spring water into a city sewer, that it may be absolutely wasted. And this doctrine of correlative rights and obligations between landowners respecting the appropriation and use of percolating waters has been maintained in at least one state. Bassett v. Salisbury, 43 N. H. 569; Swett v. Cutts, 50 N. H. 439,—in which the maxim, "Sic

utere tuo ut alienum non lædas," was applied, and it was held that no good reason could be given why it should not be applicable in all cases where the rights of owners of adjoining lands to collect and use percolating waters are in apparent, although not real, hostility.

The subject of wholesome water for domestic purposes in our cities is fast becoming one of overwhelming importance, and the courts may have to step forward and out of the beaten paths to formulate additional, and perhaps new, rules in order to protect our citizens, and to preserve for their use a wholesome and sufficient supply. It may become absolutely necessary, in order to secure the public health, that noticeable departures be made from the doctrines which have heretofore prevailed, but which have become inefficient, inapplicable, or possibly, radically wrong, under changed and developing conditions. When that time comes, and the subject is presented, no court should feel itself bound to adhere to a previously announced rule of law, for which no substantial reason can be given, or for which a good ground no longer exists. Great injury, distress, and disaster to the public must be prevented, although time-honored precedents, of no value, are swept aside. The justification for such a course lies, as it often does in matters for legislative action, in the fact that the public is vitally and sufficiently interested, and must be protected. In Toledo A. A. & N. M. Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 746, 751, the following language, which should meet the approval of every equity court, was used: "Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent. If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief."

But in holding as we do, and in laying down a rule which confessedly is something of a departure from the general doctrine found in the books, and is an advanced position, we are not really

89 M.—5

discarding the maxim, "Cujus est solum ejus est usque ad cœlum," or doing violence to any of the reasons which have been given for it. We are not involving any set of legal rules in hopeless uncertainty, and therefore rendering their application practically impossible, for the rule which we adopt is not only just, but it is exceedingly plain, certain, practical, and easy to apply to real conditions. Nor will our recognition of the doctrine of correlative rights interfere in any manner with material improvements, to the detriment of the state. On the contrary, it will tend to promote the prosperity and general welfare of all citizens whose necessities bring them within its influence. Nor are we entirely without authority for such a doctrine. We therefore formulate and announce the rule governing the facts here to be that, except for the benefit and improvement of his own premises, or for his own beneficial use, the owner of land has no right to drain, collect, or divert percolating waters thereon, when such acts will destroy or materially injure the spring of another person, the waters of which spring are used by the general public for domestic purposes. He must not drain, collect, or divert such waters for the sole purpose of wasting them. Briefly stated, a landowner must not collect and wantonly waste percolating waters which would otherwise be, or have theretofore been, appropriated by his neighbor for the general welfare of the people. If he does, an action to restrain and prohibit such waste may be maintained by the party injured.

Attention is here called, as an authority for this proposition, to Smith v. City (Sup.) 46 N. Y. Supp. 141, an exceedingly well written and able opinion, affirmed in 160 N. Y. 357, 54 N. E. 787. It was there said, in substance, that it seemed clear from the reasoning in several cases, which were cited, that the right to collect and appropriate percolating waters, which right has always been upheld, relates to the beneficial use of the waters, or to the beneficial use of the land for some purposes for which it can be used connected with its enjoyment as land, for the ordinary purposes of agriculture, mining, domestic purposes, or improvement, either public or private; and it was held — going much further than necessary in this case, and establishing a radical rule

—that the owner of land could not gather percolating water by pumps, or by natural means, that it might be carried to a distant place, for the use of strangers, having no right to it, in a case where the inevitable result would be to destroy a spring upon the land of an adjoining owner. The right, said the court, is predicated upon the right of the owner to benefit the land itself, or to himself enjoy the beneficial use of the waters found in the soil thereof.

The doctrine we now lay down has been to some extent recognized in other cases, although the exact question was not presented. See Chatfield v. Wilson, 28 Vt. 49; Pixley v. Clark, supra; Frazier v. Brown, supra; Burroughs v. Saterlee, 67 Iowa, 396, 25 N. W. 808; Wheatley v. Baugh, 25 Pa. St. 528; Collins v. Chartiers, 131 Pa. St. 143, 18 Atl. 1012, and the New Hampshire cases before referred to. In no case brought under our observation has the right of the owner of the soil to collect percolating waters that he may dissipate and waste them been recognized or upheld.

This doctrine also finds support in the reasoning found in the opinions filed in the somewhat noted case of Ohio v. State, 150 Ind. 698, 50 N. E. 1124, affirmed in 177 U. S. 190, 20 Sup. Ct. 576. The legislature of the state of Indiana had prohibited the wasting of natural gas and petroleum oil from wells by permitting the escape of either into the open air. An action was brought and successfully maintained by the state to enjoin and restrain an oil company from allowing natural gas to escape and waste in violation of this statute. The rules which govern subsurface waters, coal oil, and natural gas—all minerals—are the same under the authorities, and the arguments made in that case in behalf of the defendant and in support of the contention that the statute was unconstitutional were based upon the claim that, as the gas in or under the defendant's land is part of the land itself, which was conceded, the owner of the soil had the lawful right to assert absolute dominion over all that is found in or under it, including all minerals, to the center of the earth, and for an unlimited distance upwards from the earth's surface—the exact claim asserted here. It was there held that the statute was constitutional, and that the state, representing its citizens, had the right, as a matter of public

policy, to maintain the action, and forever to restrain and enjoin the defendant from violating the prohibitory law. The learned arguments found in the opinions rendered in the state and federal courts are pertinent to the present case.

Order reversed, and a new trial granted.