CITY OF PLEASANTON et al.

v.

LOWER NUECES RIVER SUPPLY DIST. et al.

LOWER NUECES RIVER SUPPLY DIST. et al.

v.

CITY OF PLEASANTON et al.

No. 12613.

Court of Civil Appeals of Texas.

San Antonio.

Dec. 30, 1953.

Rehearing Denied Jan. 27, 1954.

Bobbitt, Brite & Bobbitt, San Antonio, Frank W. Steinle, Jourdanton, for appellants.

Fischer, Wood & Burney, I. M. Singer, Hodge Thompson, C. Burtt Potter, Ralph R. Wood, Corpus Christi, for appellees.

NORVELL, Justice.

As this case involves a cross-appeal, the parties will be designated as in the trial court. The defendant Lower Nueces River Supply District (hereinafter sometimes referred to as District) is a municipal corporation which has a contract obligating it to supply fresh water to the defendant City of Corpus Christi. In order to obtain the amounts of water necessary to supply the City, as well as other water users having contracts with it, the District purchased and leased certain lands in Atascosa County, Texas, and drilled four large water wells thereon. These wells were drilled into the Carrizo Sands which extend across the State from near Lufkin in East Texas, through and under Atascosa County and into the Republic of Mexico. These sands carry large quantities of water and wells penetrating the same are widely used in Atascosa County to obtain water for domestic, municipal and commercial uses. The water brought to the surface from the four wells drilled by the District is turned into the Atascosa River near the town of Campbellton and allowed to run down stream into the Nueces River, and thence into Lake Corpus Christi, a reservoir located near Mathis, Texas, having a capacity of 34,000 acre feet of water, and thence from the lower end of the storage reservoir or lake to a settling basin located at Calallen, some fifteen miles west of the City of Corpus Christi. The distance from the wells to the upper reaches of Lake Corpus Christi at Mikeska is approximately fifty-seven miles; the lake itself is about twenty-five miles in length (from Mikeska to the dam) and the Calallen settling basin is approximately thirty-six miles below the dam. The water from the wells is thus transported a distance of approximately 118 miles in open rivers or lakes.

The City of Pleasanton, four other municipalities located in Atascosa County and twelve individual land owners of the county brought suit against the District and the City of Corpus Christi, seeking to enjoin said defendants from making further use of the four wells mentioned and restraining them from drilling additional wells.

Trial was to the court without a jury and a decree rendered which provided that:

"1. Plaintiffs are hereby granted a perpetual injunction restraining Defendants from discharging water from artesian wells into the Atascosa River and from transporting it down said river and the Nueces River to the reservoir at Mathis.

"2. The perpetual injunction herein granted is hereby stayed as to the existing wells involved herein until Defendants have completed a dam and filled the reservoir, or for five years from this date, whichever occurrence comes first in point of time."

The court stated in face of the decree certain conclusions of fact and law, as a basis for the judgment rendered, which are as follows:

"The acts of the Defendants in discharging the water from the wells in-

volved herein into the Atascosa River and transporting such water down the bed of the Atascosa River and Nueces River to the reservoir at Mathis, and thence to Calallen, by reason of the amount of water lost in such process constitutes waste in violation of the statutes and the conservation laws of the State of Texas, and results in damage and injuries to Plaintiffs, and that Plaintiffs are accordingly entitled to an injunction restraining such acts of Defendants, even though the amount not lost is put to beneficial use. * * That Defendants drilled and have operated said wells as an interim emergency augmentation to their regular water supply, and that to make the injunction effective at this time would result in great and manifest hardship to a large number of people, and that to stay this injunction as to the existing wells involved herein which the Court finds at this time, under the circumstances now existing, are sufficient and necessary to meet the present emergency, until such time as a dam has been built and the reservoir filled creating an adequate supply, or until five years from this date, whichever event comes first, which five-year period the court finds to be a reasonable time for the construction of such dam and the filling of the reservoir under the circumstances now existing, would not result in or cause substantial or material injury or damage to Plaintiffs, and equity requires such stay under these circumstances. In this connection, it is further found that Defendants have used and exercised, and are now using and exercising, all reasonable diligence in their efforts to obtain an adequate supply of water by the construction of a dam on the Nueces River."

In 1952 this case was before us upon an appeal from an order overruling a plea of privilege. The nature of the suit filed by the plaintiffs was the matter to be determined, and in order to decide this issue we, necessarily, considered a number of component questions. Defendants as cross-appellants assert many of the same contentions presented upon the former appeal. Our position heretofore stated and our holdings previously set forth have been re-examined. We see no reason to depart therefrom and shall therefore briefly indicate the holdings supported by and reasonably inferred from the authorities and arguments set forth in the former opinion, Lower Nueces River Water Supply District v. City of Pleasanton, Tex.Civ.App., 251 S.W.2d 777, viz.:

1. By the case of Houston & T. C. R. Co. v. East, 98 Tex. 146, 81 S.W. 279, 66 L.R.A. 738, 107 Am.St.Rep. 620, the State of Texas is committed to the English rule applicable to percolating waters.

2. That such rule, at least as enforced in Texas, does not, however, permit the wasting of percolating waters, as the wasting of such natural resources is against the public policy of the State.

3. That any one whose lands or property rights are adversely affected by the wasting of percolating waters may maintain an injunction to stay such waste.

4. That a petition is a sufficient basis for injunctive relief if it charges that a defendant is not making a reasonably effective use of percolating waters brought to the surface by him, but, on the contrary is wasting the same, and that the removal of such waters from the underlying sands adversely affects the plaintiff's property interests.

Under our analysis, there remain but two substantial issues in the case represented by the following contentions:

1. Defendants' assertion that the evidence is insufficient in law and in fact to support the allegations of the petition that defendants were guilty of wasting water.

Plaintiffs' assertion that the trial court was without authority to stay the injunction granted or that he abused his discretion in so doing.

We are of the opinion that the evidence supports the trial court's finding that

the method of transporting the water from the wells near Campbellton to the settling basin at Calallen involves a wastage of water. There is some conflict in the testimony as to the percentage of water lost during its flow through the open conduits employed. The lowest estimate was placed at approximately twenty per cent. However, one engineer stated that in his opinion, under conditions existing in April of 1951, only twenty-six per cent of the Campbellton well water reached Calallen, and that in August of the same year the percentage of loss was sixty-three per cent. It seems that the loss was occasioned by evaporation, seepage and transpiration, that is, the absorption of water by plants, trees and vegetation along the course of the rivers and lake. Some of the discrepancy in the estimates of the precentages of water lost may be accounted for by the respective allocations of carriage water as between the well water and run-off water from other sources usually flowing in the streams; carriage water being that which is naturally absorbed by the banks and bed of a stream before any water will flow in the water course. It seems also that certain estimates were based upon river or stream measurements which did not take into consideration various additions to the water supply which naturally flow into the streams involved between Campbellton and Calallen. However, regardless of whether these variations in the evidence may be resolved or not, it appears that the question of the existence of waste was a matter for the decision of the trial court, and that the evidence amply supports the conclusion stated in the judgment. We are further of the opinion that actual property damage to plaintiffs was shown to have resulted from the operation of defendants' wells. These wells when opened flow at the rate of ten million gallons of water per day. It is contended that the operation of these wells causes no actual water depletion in the Carrizo sands in the area because of a replenishment of the water supply resulting largely from surface waters flowing into an outcropping of the sands in the northern part of Atascosa County, but it does appear that these wells cause a lessening of the water pressure in an area surrounding the wells in the form of an inverse cone, and that this "draw down" of pressure has resulted in the lowering of the water level in the wells operated by plaintiffs and a consequent increase in operating costs. It should perhaps also be stated, as a part of the entire water picture in the area, that at the time of the trial it was estimated that there were more than 200 wells in the area and that more were being drilled. Any and all wells drilled into the sands have some effect in lessening the pressure and lowering the water level, depending upon the size and capacity of the respective wells.

We are also of the opinion that under the factual situation disclosed by the record of this case, the trial court did not err in staying the effective date of the injunction. Although suggesting that some modification of the water law of "England's green and pleasant land" may have to eventually be made by proper and constitutional authority, plaintiffs are not here basing their argument against the stay order upon the proposition that the East case, Houston & T. C. R. Co. v. East, 98 Tex. 146, 81 S.W. 279, should be overruled. In fact, under the rule of stare decisis such argument could not well be made here, but only in the Court of ultimate jurisdiction. Accepting then the theory of ownership of percolating waters as declared in the East case, it necessarily follows that the action of the District in drilling the water wells upon property owned or leased by it for such purpose was not unlawful. The wrong therefore upon which equitable intervention by injunction must be based is the wastage of a natural resource because of the failure or inability to make a reasonably efficient use thereof. Here we enter a field of relative factors and considerations and the rule of balancing of equities is pertinent. Boyd v. City of San Angelo, Tex.Civ.App., 290 S.W. 833; Hogue v. City of Bowie, Tex.Civ.App., 209 S.W.2d 807. The application of this principle may in certain cases operate to defeat the prayer for injunction altogether. In other cases, it may determine the terms and form of the decree, including the effective date thereof, depend-

ing upon the circumstances of the particular case. In Corpus Juris Secundum it it said that:

"The court may in its discretion suspend the operation of an injunction or restraining order. It may in the decree itself provide that the operation of the injunction shall be stayed for a certain length of time or until the happening of a condition; * * *." 43 C.J.S., Injunctions, § 219, page 959.

In the present case, it appears that the District has no intention of drilling further wells in the area. The four wells now in operation were drilled at a cost of $304,000. The cost of constructing enclosed conduits for transportation of the water from Campbellton to Calallen would approximate $5,000,000. This mode of transportation is regarded as impractical, so that the District and the City of Corpus Christi have explored other possibilties of obtaining an adequate water supply. The District, shortly after its creation, in conjunction with the Federal Bureau of Reclamation, recommended a site for a dam near the town of Oakville in Live Oak County. This plan, known as the "Oakville Project," would have provided a storage reservoir of an estimated 1,200,000 acre feet, but was eventually disapproved by the Governor on recommendation of the Board of Water Engineers in January of 1952. Thereafter, another site for a dam was chosen, near Mathis, Texas, and in December of 1952 a $15,000,000 bond issue was voted to construct a dam upon the Nueces River, which would create a reservoir of an estimated capacity of 300,000 acre feet. At the time of the trial, the four Campbellton wells were being operated only under emergency conditions, that is, when the level of the present reservoir drops below seventy-three feet and the flow of the river is insufficient to meet the demands upon the District. It appears that approximately 200,000 people are dependent upon the Corpus Christi water supply, as well as various industries and the United States Naval Air Station located on Flour Bluff, south of the City of Corpus Christi.

In our opinion, the evidence discloses circumstances of extreme stringency and emergency, a situation not present in the case of Lambert v. City of Port Arthur, Tex.Civ.App., 22 S.W.2d 320, cited by plaintiffs, as appears from the opinion rendered therein. It further appears that active and appropriate procedures have been set in motion to provide and secure an adequate water supply for the City of Corpus Christi and others dependent upon its water system, without the necessity of using the water wells involved in this litigation. We believe the court below properly balanced the equities of the parties and entered an appropriate stay order.

The case seems to have been fairly and ably tried. We find no reversible error in the record, and the judgment of the trial court is accordingly affirmed.