# CITY OF CORPUS CHRISTI V. CITY OF PLEASANTON ET AL

No. A-4543. Decided March 9, 1955.
Rehearing denied April 13, 1955.
(276 S.W. 2d Series 799)

*I. M. Singer,* City Attorney, and *Hodge Thompson,* both of Corpus Christi, for petitioner.

The Court of Civil Appeals erred in holding that the acts of the defendants in transmitting waters from said well through the channels of the named rivers constitutes waste and that such waste was damaging to the plaintiffs. Also in failing to hold that the State Board of Water Engineers was a necessary party to the suit and was the proper authority to bring a suit for alleged waste of said water. United North and South Oil Co. v. Meredith, 258 S.W. 550; Jone v. Highland Memorial Park, 242 S.W. 2d 250; Texas Co. v. Burkett, 296 S.W. 273.

*Bobbitt, Brite & Bobbitt,* of San Antonio and *Frank N.* Steinle, of Jourdanton, for respondents.

On the theory that the acts of defendants constituted waste and plaintiffs were entitled to injunctive relief cited Cantwell v. Zinser, 208 S.W. 2d 577; Houston and Texas Central Ry. Co. v. East, 98 Texas 146, 81 S.W. 279; Brazos River Con. & Rec. Dist. v. Allen, 116 S.W. 2d 1171.

MR. JUSTICE CALVERT delivered the opinion of the Court.

Our main question here is whether it is waste to transport water produced from artesian wells by flowing it down a natural stream bed and through lakes with consequent loss of water by evaporation, transpiration, and seepage. For a detailed statement of the facts, reference is made to the opinions of the Court of Civil Appeals on the plea of privilege in Lower Nueces River Water Supply Dist. v. City of Pleasanton, at 251 S.W. 2d 777, and on the main case, 263 S.W. 2d 797, affirming a trial court judgment against petitioners enjoining them from flowing their wells into the river but staying the injunction for a period of five years or until the City of Corpus Christi completed a certain dam and filled the reservoir, whichever occurrence came first in point of time.

One of the defendants in the trial court, Lower Nueces River Supply District, is a municipal corporation created under Chapter 159, Acts 1949, 51st Legislature. It has four large water wells

drilled upon land it owns. It has contracted to furnish water to the petitioner City of Corpus Christi. For that purpose, it flows its wells into the Nueces River which in turn flows into Lake Corpus Christi. From there water is conducted by natural channel to a settling basin at Calallen. Calallen is a total distance of one hundred and eighteen miles from the wells. When the wells are fully opened, they discharge water into the river at the rate of ten million gallons of water per day. It was estimated that there are two hundred wells producing from the Carrizo sand in the vicinity of the wells among which are wells owned by respondents. (Five municipalities and twelve individual land owners.) There was evidence that at times as much as 63 to 74% of the water discharged into the river escaped through evaporation, transpiration and seepage and never reached its destination to be put to a beneficial use.

There are numerous questions presented by the application for writ of error, but in view of the disposition we make of the main question stated in the beginning of this opinion we need not consider the others.

Respondents' suit was founded, in large part, on the provisions of Article 7602, Revised Civil Statutes, 1925, and Article 846 of the Penal Code. Article 7602 of the Civil Statutes defines waste of artesian water and Article 846 of the Penal Statutes declares such waste to be a penal offense. They are in substantially the same language. Article 7602 reads as follows:

"Waste is defined for the purposes of this Act, in relation to artesian wells to be the causing, suffering or permitting the waters of an artesian well to run into any river, creek or other natural water course or drain, superficial or underground channel, bayou, or into any sewer, street, road, highway, or upon the land of any other person than that of the owner of such well, or upon the public lands or to run or percolate through the strata above that in which the water is found, unless it be used for the purposes and in the manner in which it may be lawfully used on the premises of the owner of such well. Id. p. 233, Sec. 92."

The trial court concluded that the discharging of the water into the river and the transporting of it down natural stream beds, by reason of the amount of water lost in the process, constituted "waste in violation of the statutes and the conversation laws of the State of Texas." The Court of Civil Appeals rested its judgment of affirmance on public policy rather than on an

interpretation of the statutes. It is our opinion that a decision of the question here presented must be controlled by the statutes.

It should be remembered that Articles 846 of the Penal Code and 7602 of the Civil Statutes were not the origin in this state of the right to use percolating water off of the premises of the owner or of the right to use the various means of transporting it mentioned in those statutes; those rights existed in the common law as a brief examination will establish.

The rights of the landowner in percolating water beneath his land were adjudicated in England just over 100 years ago. In Action v. Blundell, 12 Mees. & W. 324 (1843), it was said: "That the person who owns the surface may dig therein, and apply all that is there found to his own purposes, at his free will and pleasure; and that if, in the exercise of such right, he intrecepts or drains off the water collected from the underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of damnum absque injuria, which cannot become the ground of an action." In the course of time this became known as the "common-law" or "English" rule and it remains the rule in England and in a great many of the states of this Union today. Under this rule percolating waters are regarded as the property of the owner of the surface who may, "in the absence of malice, intercept, impede, and appropriate such waters while they are upon his premises, and make whatever use of them he pleases, regardless of the fact that his use cuts off the flow of such waters to adjoining land, and deprives the adjoining owner of their use." 55 A.L.R. 1390. In the course of time, also, another rule, known variously as the "American," "reasonable use," and "correlative rights" rule grew up in some of the American jurisdictions. It had its origin in the New Hampshire case of Bassett v. Salisbury Mfg. Co., 43 N.H. 569, 82 Am. Dec. 179. As the titles imply, this rule recognizes that the right of the surface owner of land to take water from a common reservoir is a limited right. To exactly what extent it is limited is not here pertinent. Te modern tendency is toward this latter rule. For the general history, limits and application of the two rules, see 56 Am. Jur., Waters, Secs. 111-121, pp. 593-604; 55 A.L.R. 1385-1408; 109 A.L.R. 395-403; 67 C.J., Waters, Secs. 254-258, pp. 837-841.

With both rules before it, this Court, in 1904, adopted, unequivocally, the "English" or "Common Law" rule. Houston & T. C. Ry Co. v. East, 98 Texas 146, 81 S.W. 279, 280, 107 Am. St. Rep. 620, 66 L.R.A. 738. The opinion in the case shows quite

clearly that the court weighed the merits of the two rules—"The practical reasons upon which the courts base their conclusion (applying the 'English' rule) fully meet the more theoretical view of the New Hampshire Court (applying the 'American' rule) and satisfy us of the necessity of the doctrine"—and, whether wisely or unwisely, made a deliberate choice. That the choice was considered and deliberate is made doubly clear when it is considered that the Court of Civil Appeals had made the opposite choice in the same case (77 S.W. 646, 647), choosing to follow the reasoning of Bassett v. Salisbury Mfg. Co. rather than that of Action v. Blundell. It may be noted that the Court of Civil Appeals gave its approval to the holding of the Vermont Court that the right to take percolating water was "limited to the amount necessary for the reasonable use of the land, as land," suggested that to apply the 'English' rule to the facts of the case "would shock our sense of justice," and spoke of the rights of adjoining owners as "correlative." In differing with the Court of Civil Appeals this Court approved the language of the Supreme Court of Ohio in Frazier v. Brown, 12 Ohio St. 294, where it said: " 'In the absence of express contract and a positive authorized legislation, as between proprietors of adjoining land, the law recognizes no correlative rights in respect to underground waters percolating, oozing, or filtrating through the earth * * *'."

The precise question this Court had before it in the East case was whether the Railway Company was liable in damages to East on a state of facts showing that by the use of a steam pump, installed in a well on its city lots, the Company had been capturing over 25,000 gallons of percolating water per day for use in locomotives and machine shops off of the premises where the well was located, and had thereby completely cut off the supply of water which had been entering East's well on his property. Thus it may be said that by its decision the court, in adopting the "English" rule established at least this much: that an owner of land had a legal right to take all the water he could capture under his land that was needed by him for his use, even though the use had no connection with the use of the land as land and required the removal of the water from the premises where the well was located. The court had no occasion, of course, to actually decide any other question.

Having adopted the "English" rule it may be assumed that the Court adopted it with only such limitations as existed in the common law. What were these limitations? About the only limitations applied by those jurisdictions retaining the "English"

rule are that the owner may not maliciously take water for the sole purpose of injuring his neighbor, 55 A.L.R. 1395-1398; 67 C.J., sec. 257, p. 840; or wantonly and wilfully waste it. 56 Am. Jur., sec. 119, p. 602; Stillwater Co. v. Farmer, 89 Minn. 58, 93 N.W. 907, 60 L.R.A. 875. There certainly was no limitation that prohibited the use of the water off of the premises where it was captured. Neither was there any restriction of its use to a particular area. "Under the so-called 'common-law' or 'English' rule, which prevails in some jurisdictions, the right to extract artesian water for use outside the basin or district in which it is found would seem to be unrestricted." 56 Am. Jur., Sec. 118, p. 601. Moreover, by its holding in Texas Co. v. Burkett, 117 Texas 16, 296 S.W. 273, 54 A.L.R. 1397, decided some ten years after the adoption of the Conservation Amendment to the Constitution (Article XVI, sec. 59) and the enactment of Articles 7602, V.A.C.S. and 846, Penal Code, this Court established that under the common-law rule there was no restriction against the sale of percolating waters for industrial uses off of the land. The Court said the waters "were the exclusive property of Burkett (the owner of the land on which the water was captured) who had all the rights incident to them that one might have as to any other species of property."

1 It thus appears that under the common-law rule adopted in this state an owner of land could use all of the percolating water he could capture from wells on his land for whatever beneficial purposes he needed it, on or off of the land, and could likewise sell it to others for use off of the land and outside of the basin where produced, just as he could sell any other species of property. We know of no common-law limitation of the means of transporting the water to the place of use. Neither do we know of any judicial modification in this state of the rule of the East case. There is an inference by the Austin Court of Civil Appeals in Cantwell v. Zinser, 208 S.W. 2d 577, that the common-law rule would be modified in this state to protect a landowner against waste of percolating water by his neighbor in permitting escape thereof from an earthen tank, but that case has no writ history and there is no basis for such a modification in either the East case or the cases cited therein as the Austin Court infers.

2 It was in this common-law setting that Articles 7602 of the Civil Statutes and 846 of the Penal Code were enacted. The statutes, by their very terms, recognized the right to use artesian water off of the premises of the owner of a well and recognized also the right of the owner or user of the water to transport it by any of the means enumerated to the place of use. They did

not purport to make such use unlawful nor to declare that water could not be transported from land where captured to a place of use by river, creek, or other natural water courses or drains. The purpose of the two statutes was to make the use of any of the means of transportation therein enumerated — " * * * river, creek, or other natural water course or drain, superficial or underground channel, bayou, * * * sewer, street, road, highway * * *" — both a civil and penal wrong *only* if the water was to be put to an unlawful as distinguished from a lawful use. Quite obviously the gravamen of the wrong was not the flowing of the water into a particular type of conduit from which a large percentage of the water might evaporate (there could hardly be much evaporation from an underground channel or a sewer) but the flowing of it into any type of conduit for the purpose of removing it from the premises where produced if it was to be used for an unlawful purpose. The statutes did not declare what uses would be lawful and what unlawful, but they prescribed a test for determining that matter. The use would be lawful if for the purposes and in the manner in which the water could lawfully be used on the premises of the owner, and in this event, transporting the water by the means mentioned in the statutes would not be a civil wrong or "waste"; otherwise, the use would be unlawful and the transportation would be a civil wrong and "waste." This, it seems to us, is a resonable construction of the statutes. It leaves no room for the different test adoped by the minority opinion. Whether the use to which the water is put is lawful or unlawful cannot reasonably turn on whether some of the water put in the conduit escapes during transportation. The Legislature well knew that if transported by "river, creek, or other natural water course or drain" some of the water would escape. Having approved the transportation of artesian water by the means enumerated in the statutes where the water was to be put to a lawful use, with knowledge that some of it would escape during transportation, the Legislature could hardly have intended that what it had approved as legal should become illegal if some of it did escape. Moreover, if the escape of the water is an unlawful "use" within the meaning of the statutes, then the percentage of the escape through evaporation, seepage, etc. is wholly immaterial; the use to which the water is put cannot be a "little bit" unlawful on one occasion and a "whole lot" unlawful on another.

**3** Articles 7602 of the Civil Statutes and 846 of the Penal Statutes became effective in June, 1917. In August of the same year the people adopted the Conservation Amendment (Article XVI, sec. 59) to the Constitution declaring the conservation of

the state's natural resources, including water, to be a public right and duty. But the Amendment was not self-enacting. By the very terms of the Amendment the duty was enjoined upon the Legislature to implement the public policy found therein. It was said: "* * * * and the Legislature shall pass all such laws as may be appropriate thereto." No such duty was or could have been delegated to the courts. It belongs exclusively to the legislative branch of the government. Undoubtedly the Legislature could prohibit the use of any means of transportation of percolating or artesian water which permitted the escape of excessive amounts, but it has not seen fit to do so. The power certainly does not lie with the courts to usurp the legislative functnon and say what types of conduits and reservoirs may be used for the transportation and storage of water, lawfully obtained and lawfully used. Particularly may they not declare the use of certain types of conduits and reservoirs to be unlawful when the Legislature itself, by necessary implication, has declared them to be lawful.

The Legislature is now in session. It will have this opinion before it before adjournment. It will recognize the problem. If it wishes to declare that the transportation of water in coduits which permit the escape of a large perctntage is wasteful and unlawful it will have ample time in which to do it.

We are thus brought to the conclusion that the question posed by the statutes is not a fact question at all but a law question. That law question is this: Is the water being transported to Corpus Christi to "be used for the purposes and in the manner in which it may be lawfully used on the premises of the owner" of the wells?

While, as has been stated, respondents' right to relief was founded, in large part, on the statutes we have discussed, they neither pleaded nor do they claim that the water being transported to the City of Corpus Christi and other purchasers is being used for purposes and in a manner which would not be lawful on the premises of the owner of the well. The five respondent municipalities are themselves using water obtained from the same sands "for domestic, municipal, and industrial purposes."

Respondents' pleading does not inform us of the nature of the uses to which the water is put by the purchasers from Lower Nueces River Supply District, nor by their prayer do they seek to enjoin any particular use of the water by the purchasers.

Their case is predicated on the theory that the defendants are wasting the water by flowing it down natural river courses and stream beds, in violation of the statutes, with consequent evaporation, transpiration and seepage, making it necessary that they take excessive amounts of water from the common reservoir to the deteriment of the respondents who have equal or "correlative" rights in the water supply. They prayed only that the defendants be enjoined from flowing the water into natural water courses and from withdrawing from the reservoir such quantities of water as would draw down and effect the water level in respondents' wells. This pleading afforded no basis for injunctive relief, either under the statutes or the rules of common law prevaling in this state.

The trial court found that the respondents were entitled to an injunction because of the loss occasioned by the means used for transporting the water "even though the amount not lost is put to a beneficial use," and accordingly its writ ran only against discharging the water into and transporting it through natural stream beds—not against any use made of the water after it reached its destination. The injunction granted finds no support, in law, in the statutes as we have interpreted them, in the Conservation Amendment to the Constitution, or in the public policy of this state.

The judgments of both courts below are reversed and judgment is here rendered dissolving the injunction.

Opinion delivered March 9, 1955.

MR. JUSTICE GRIFFIN dissenting.

The majority opinion determines the question of whether or not "waste" is present in this case by considering only the amount of water that reaches its destination, rather than by considering the total amount of water produced at the mouth of the well. This is clearly error, and to so consider the question of waste, is to wholly ignore the expressed purpose of the conservation amendment. If no consideration is to be given the amount of water that is dissipated between the time of its production and time of use, then we can never have waste.

The fallacy of the majority opinion is easily demonstrated. It argues that the wrong which the statute seeks to prevent is not the "flowing of the water into a particular type of conduit from which a large percentage of water might evaporate, but

the flowing of it into any type of conduit for the purpose of removing it from the premises where produced if it was to be used for an unlawful purpose." This reasoning entirely overlooks the very purpose for which the conservation amendment and the statutes were passed, and by judicial construction makes the *gravemen* the use of only so much of the water as finally reaches its destination. The Legislature, in passing the statute, was not attempting to prevent the use of water, but it was seeking to prevent the waste of water—our greatest natural resource. To more clearly illustrate the point—under the proof in this case some 10,000,000 gallons of water are withdrawn daily from the reservoir when the wells are operated, only 2½ million gallons finally reach their destination for use by the city; this use is a lawful use; therefore, argues the majority, no waste occurs. The same reasoning would hold no waste occurs if only ten gallons reach their destination if this ten gallons is used lawfully. To so construe the statute is, in my opinion, to hold that the Legislature did a vain and useless thing which accomplishes no purpose in conserving our natural resources—in this case underground water—but, on the contrary, will permit the depletion of a reservoir so long as one gallon is used lawfully, regardless of what happens to the 9,999,999 gallons dissipated daily, and put to no lawful use. I say such a construction makes the statutes in question void and in direct opposition to the conservation amendment. You must consider whether the 9,999,999 gallons dissipated plus the one gallon used are put to a lawful use; you must consider the use to which the total production is put.

It is a fundamental rule of statutory construction that when courts have a choice to construe statutes so that one construction gives the statute a valid, legal and reasonable construction which will effect the intent and purpose of the Legislature in the passing of a law, or a construction which gives a statute no meaning to accomplish the purpose for which it was passed and makes the statute void, meaningless and of no force and effect, and holds that the Legislature accomplished nothing and only used a jumbled jargon of ineffective words to bring about a negative result; then, the courts must give a statute the former construction. This the majority refuses to do, but under the guise of preserving the legislative branch of the government (and it should be preserved), adopts the latter and wholly meaningless construction. According to the majority opinion "waste" is only present when the residue water is run into "the sea or sinkhole" or other like use.

I do not believe that an owner of the well would be lawfully using the water pumped from his well if such owner only put 25% thereof to a beneficial use. Such owner should not be permitted to dissipate 75% of his production just because he used the 25% residue lawfully.

For these reasons, and many, many others which readily suggest themselves to me, if we are to conserve our natural resources, I must join in the dissent in this cause. I think the judgment of the Court of Civil Appeals should be affirmed.

Opinion delivered March 9, 1955.

MR. JUSTICE WILSON, joined by JUSTICE CULVER, dissenting.

I respectfully dissent.

This is an outpost skirmish over the waters of the Carrizo sand. Here we hold that a distant city, after purchasing a few acres of land upon which it drills four big artesian wells, can flow ten million gallons of water a day into a stream from which (under the evidence and the finding of the trial court) it recovers only about twenty five per cent of the artesian water. In doing this it can disregard any injury to or effect upon the wells of other property owners drawing water from a common reservoir to irrigate local farms and to supply local communities. To me this seems obviously unjust and a bad situation. The majority feel compelled to this result by the belief that the problem is primarily legislative. It is indeed commendable for a court to impose upon itself a rigid self control in refusing to trespass upon the legislative function, but I do not believe the courts to be impotent in preventing such a waste and especially so when existing legislation properly construed against the common-law background would prevent it.

Just as a court could not command one end of a seesaw not to move when the other end moves, it cannot be fiat make uncorrelative that which in physical nature is in fact correlative. The result actually reached by the court is to give to one person the unrestrained right to injure his neighbor. I have this to say about reaffirming the rationale of the East case, Frazier v. Brown, and Acton v. Blundell. These cases were decided (1843-1904) before the development of most of our present knowledge of geology and hydrology and there has been a great advance in knowledge since these decisions. In the East case the court takes its rationale from Frazier v. Brown which is, essentially,

that, (one) the movement of underground waters "are so secret, occult, and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would, therefore, be practically impossible," and (two) " '* * * Because any such recognition of correlative rights would interfere, to the material detriment of the commonwealth, with drainage and agriculture, mining, the construction of highways and railroads, with sanitary regulations, building, and the general progress of improvement in works of embellishment and utility'."

This dire prediction—like much prophecy—overlooked the possibility of advance in knowledge and technique. It is understandable that this rationale should appeal to this court in 1904 but I regret to see us reaffirm it now, as the majority does, in 1955—especially in view of the development since 1904 of our comprehensive knowledge and experience in oil and gas regulation.

I am convinced that the rationale of Frazier v. Brown has been rebutted and answered by the course of our history and the entire trend of our jurisprudence since that decision and since the East case. Although this court can close its eyes to the advancement of scientific and legal knowledge and governmental techniques by reaffirming this rationale as the majority do here, I do not believe that this court will always do so, and for that reason the substance of this dissent seems worth filing.

Prior to the passage of Art. 7602, R.C.S. 1925, a landowner could not produce water from an artesian well and then waste it to the detriment and injury of his neighbors without being answerable through injunction. Although the majority recognize that one of the limitations upon a well owner even then was that he could not willfully waste the water, it assumes that prior to Art. 7602 a well owner could use a natural stream bed for transporting water, irrespective of the waste involved. I doubt this interpretation of the law. Although the adoption in 1917 of the Conservation Amendment to the State Constitution undoubtedly broadened the State's governmental powers to conserve natural resources, it does not follow that before its adoption one property owner in a common reservoir could not have enjoined a waste of water which was damaging him, irrespective of the State's governmental power to conserve its natural resources.

Therefore, it seems fundamental that once plaintiffs estab-

lish waste and consequent injury to themselves, they would have had an action without the Constitutional Amendment adopted in 1917 and without regard to Art. 7602 unless this statute gives defendant permission to flow the water down the river and lose seventy five per cent enroute.

I grant that it is within the province of the Legislature to define or redefine waste. I grant that common-law waste which might have been prevented by injunction prior to the adoption of Art. 7602 might become a permissive use after its adoption even though another property owner be injured—at least, as in the case at bar, if the injury did not amount to a complete taking of the property of another. This being true, Art. 7602 is valid legislation even though it makes permissive what was theretofore waste. But we are not required to construe a statute contrary to its spirit and intent. Here a statute intended to define and prohibit waste is construed so as to make a tremendous waste possible. Here the construction given by the majority actually nullifies the prohibitory aspect of the statute.

The movement of water from the ocean through clouds to fall on land as rain and its trip back to the ocean is called the hydrological cycle. It is not within the power of man to destroy water in any appreciable quantities but only to divert and control water as it flows toward the ocean. Rock Creek Ditch & Flume Co. v. Miller, 93 Mont. 248, 17 Pac. 2d 1074, 89 A.L.R. 200. For this reason, the legal term *waste* does not mean the destruction of water but rather its escape from beneficial use. Art. 7476, R.C.S. 1925. See also Pecos Valley Artesian Conservancy Dist. v. Peters, 50 New Mexico 165, 173 Pac. 2d 490. It is an illegal handling or abandonment by the person charged with waste. Gallio v. Ryan, 52 Nev., 330, 286 Pac. 963; Oliver v. Skinner, 190 Ore. 423, 226 Pac. 2d 507.

Here the trial court has found that under the facts of this case the transportation of water flowing it down a stream bed is wasteful. The proof established that the purpose of pumping the wells is to obtain water for use in the City of Corpus Christi. It is released into the stream only for the purpose of transportation. Obviously, that portion of the water lost enroute is not being put to a use which would be "lawful on the premises of the owner of such well" if this amounts in law to waste.

By Art. 7602 the Legislature defined waste of artesian water as permitting it to run into a natural water course unless "it

be used for the purposes and in the manner" it might lawfully be used on the premises of the owner. The use referred to must mean the use at the other end of the journey through the natural water course. Otherwise the statute is meaningless, for it would serve no purpose to prohibit running artesian water into a natural water course and then turn around and say that this in and of itself constitutes a lawful use. So far the statute to mean anything at all, the exception must refer to the water course as an instrument for transporting water comparable to a canal. Although the Legislature probably contemplated that some water might be lost in transit, it would nullify the prohibition to hold that it all might be lost in transit. If all of the water were lost in transit and none of it reached its destination, then the prohibition of Art. 7602 would apply as a matter of law. If all of the water from defendants' wells reached its destination and was there put to a use "lawful on the premises of the owner of such well," then defendants as a matter of law would be within the exception to the statute, and plaintiff could not complain. The question of whether under Art. 7602 too much water is lost to the City's use and purpose by this method of transportation is one upon which reasonable minds could differ, and therefore one of fact. Although defendants offer evidence that most of the water reached its destination, plaintiff offered evidence that at certain times only 26% of the water pumped into the river reached its destination and that at other times only 37% reached its destination.[1] Art. 7602 was enacted to prevent and not to license waste. I could not hold as a matter of law that flowing the wells into a natural water course in the case at bar is not waste as defined in Art. 7602. In view of the fact finding of waste, it is not necessary to the decision of this case to hold that as a matter of law it is wasteful. We should hold that the trial court's finding of waste has support in the evidence.

The city contends that even so it costs less money to flow water down this stream bed than it would to construct a conduit, and, in effect, its method of transportation is the most economical. But Sec. 59a of Art. XVI of the Texas Constitution enjoins the conservation of our natural resources and is not primarily concerned with the conservation of the money of one

---

1.—In an Amicus Curiae brief filed by the High Plains Underpround Water Conservation Dist. No. 1 is the following statement:

"The High Plains district is attempting to educate the water users of its district that very substantial amounts of their water are wasted when water is run down an open ditch from the well to the point of beneficial use and then out into another open ditch, gully, or bar ditch after its use. In addition to the large amounts which are simply apandoned, substantial portions of the water are lost through evaporation, transpiration, and seepage."

exploiting a natural resource. State v. Jarmon, Texas Civ. App., 25 S.W. 2d 936, wr. er. dism. While the balancing of financial advantage and disadvantage might be a factor to be considered in selecting a method of transporting water, it cannot be a controlling factor in determining the waste prohibited by both Art. 7602 and Sec. 59a, Art. XVI, Texas Constitution.

Defendants contend that since the District's production methods are not attacked as wasteful and since it owns the water, the use after production cannot be regulated by Art. 7602 and consequently the use of the water after production is of no concern to the plaintiffs, citing Houston & T. C. Ry. Co. v. East, 98 Texas 146, 81 S.W. 279, 66 L.R.A. 738. They overlook the fact that the tremendous waste after production from the ground makes necessary a much heavier flow from the wells.

Sec. 59a, Art. XVI, Texas Constitution (making the preservation and conservation of natural resources, including water, "public rights and duties") contains no language permitting the waste of a natural resource after production. The use of all property, including property rights in water, is subject to the general police power of a state. Hudson County Water Co. v. McCarter (1908) 208 U.S. 349, 28 Sup. Ct. Rep. 529, 52 L. Ed. 828; Lombardo v. City of Dallas, 124 Texas 1, 73 S.W. 2d 475. The State's power to conserve its natural resources through the creation of entities such as defendant district and the passage of legislation such as Art. 7602 is not limited to the production processes, but extends to the use after production. Ohio Oil Co. v. Indiana (1900) 177 U.S. 190, 44 L. Ed. 729, 20 Sup. Ct. Rep. 576; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 55 L. Ed. 369, 31 Sup. Ct. Rep. 337; Walls v. Midland Carbon Co., 254 U.S. 300, 41 Sup. Ct. 118, 65 L. Ed. 276; Hathorn v. Natural Carbonic Gas Co. (1909) 194 N.Y. 326, 23 L.R.A. (N.S.) 436, 87 N.E. 504; People v. New York Carbonic Acid Gas Co. (1909) 196 N.Y. 421, 90 N.E. 441; Ex parte Elam (1907) 6 Calif. App. 233, 91 Pac. 811; Eccles v. Ditto (1917) 23 N.M. 238, L.R.A. 118B 126, 167 Pac. 126.

The defendant district was itself created to carry out the State's conservation policy. The Act creating the defendant district states that it is created "Under and pursuant to the provisions of Article 16, Section 59a of the Constitution." It specifically provides that this district shall have the power and duties of a Water Control and Improvement District and it specifically incorporates by reference Chapter 25, Acts 1925, 39th Legislature (Title 128, Chapter 3a of Vernon's Civil Stat-

utes). The district's contention here that it can waste water after production from the water-bearing strata is in the very teeth of the Act creating it.

Plaintiffs and defendant district each have substantially the same property interest in the water under their land. The proof supports a finding of fact that their lands overlie a common reservoir and that the quantities of water drawn out by the defendants have materially and adversely affected neighboring wells. Defendants contend that the water taken from the reservoir through the four wells has not decreased the quantity of water taken from other wells in the same reservoir, and this seems to be true. However, there is proof that the flowing of the defendants' wells causes an inverse pressure cone which in turn results in lowering the level at which water stands in the other wells, with a consequent increase in the cost of lifting the water and other operating cost.

Although the East case was decided in 1904 before the adoption in 1917 of Section 59a of Article XVI, Texas Constitution, the court even then specifically pointed out that there was no claim of waste before it. The court said:

"* * * The defendant here is making a reasonable and legitimate use of the water which it takes from its own land, which use is not, in quality, different from, or in its consequences to plaintiff more injurious than, many upheld in the decisions. There is no claim of malice or wanton conduct of any character, and the effect to be given to such a fact when it exists is beside the present inquiry. * * *"

It is now long settled that under the power to conserve its natural resources, a state may prevent waste of a natural resource contained in a common reservoir where the reservoir is split into different ownership segments. Also, one such owner may prevent another from wastefully destroying or damaging his property. Bandini Pet. Co. v. Superior Court, 284 U.S. 8, 76 L. Ed. 136, 52 Sup. Ct. 103, 78 A.L.R. 826; Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 81 L. Ed. 510; Brown v. Humble Oil & Ref. Co., 126 Texas 296, 83 S.W. 2d 935, 87 S.W. 2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393; Corzelius v. Harrell, 143 Texas 509, 186 S.W. 2d 961; Elliff v. Texon Drilling Co., 146 Texas 575, 210 S.W. 2d 558; Stillwater Water Co. v. Farmer (1903) 89 Minn. 58, 60 L.R.A. 875, 93 N.W. 907; Barclay v. Abraham (1903) 121 Iowa 619, 64 L.R.A. 255, 96 N.W. 1080. For due process of law requires that property be

protected against destruction or damage. The general prohibition contained in Article 7602, R.C.S. 1925, against the waste of artesian water carries out the conservation policy of the State established by Section 59a of Article XVI of the Texas Constitution, and is in harmony with the definition of waste contained in Section A(6) of Article 7880-3c, R.C.S.

In the field of water law, there is no consolation to be found in the law of capture. Of what value would it be to the plaintiffs to offset defendants' wells and produce an enormous amount of water for which they have no use? This would further deplete the reservoir, reduce the pressure, and lower the standing level with consequent increase of pumping expense. Why further injure their own wells? To refer them to the law of capture in this situation is simply to say that one who has been injured may go and inflict a like injury upon his neighbor. If the law of capture has any true application to underground water, it is an extremely limited one. No one can live in a vacuum. Therefore all property rights are, to a certain extent, correlative. For this reason, I do not feel that there is any true distinction between an "absolute" and a "correlative" theory of property in artesian water. The theory, discussed in some cases and mentioned by the majority that artesian water can be used only upon the land from which it is produced has no application at all to the problem at bar. It is not the contention of plaintiffs that artesian water can only be used on the land from which it is produced. It is their contention that artesian water cannot be wasted when to do so injures a neighbor. In my opinion Art. 7602 when properly construed does not make permissive such a waste and injury, and the construction here adopted by the majority in effect nullifies the statute. I would affirm the judgments of the trial court and the Court of Civil Appeals.

Opinion delivered March 9, 1955.

Rehearing overruled April 13, 1955.