# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## 03-02-00724-CV

**The City of San Marcos, Texas; San Marcos River Foundation and
Dr. Jack Fairchild, Appellants**

**v.**

**Texas Commission on Environmental Quality, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. 99-08847, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

Appellee Texas Commission on Environmental Quality[1] ("the Commission") accepted an administrative law judge's (ALJ) proposal to grant appellant The City of San Marcos ("the City") a permit to convey discharged wastewater effluent in the San Marcos River and to divert water from the river at a point approximately three miles downstream from the discharge point. The

---

[1] By statute effective September 1, 2001, the legislature changed the name of the Texas Natural Resource Conservation Commission to the Texas Commission on Environmental Quality, to be effective January 1, 2004. The statute granted the TNRCC authority to adopt a timetable for phasing in the change of the agency's name, so that until January 1, 2004, the agency may perform any act authorized by law under either title. *See* Act of April 20, 2001, 77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1985. On September 1, 2002, the agency began using its new name, while continuing to recognize the former.

Commission imposed certain limiting conditions on the permit in a final order. Appellants San Marcos River Foundation and Dr. Jack Fairchild (collectively "the Foundation") sought judicial review of the Commission's final order, as well as an interim order, in the district court. *See* Tex. Gov't Code Ann. § 2001.171 (West 2000); Tex. Water Code Ann. § 5.351 (West 2000). The City sought judicial review of the final order's imposition of limiting conditions on the permit. The district court affirmed the Commission's orders in all respects. On appeal, the Foundation argues that the district court erred because no legal authority permits the City to divert state water without an approved appropriative right; in the alternative, the Foundation argues that the Edwards Aquifer Authority Act nullifies the Commission's authority to grant the permit in the first place.[2] The City asserts various issues challenging the special conditions imposed on the permit. Because we conclude that there is no common-law right by which the City can retain ownership over its wastewater effluent after discharging it into a state watercourse, we will reverse and render judgment for the Foundation.

## FACTUAL AND PROCEDURAL BACKGROUND

The City obtains its municipal water supply from wells drilled into a groundwater formation known as the Edwards Aquifer. In 1995, the City submitted to the Commission an application for a permit to use the bed and banks of the San Marcos River to convey treated sewage effluent, created by the City's municipal use of groundwater from the Edwards Aquifer, from the

---

[2] In the event that this Court overrules the Foundation's appeal, the Foundation supports all of the conditions imposed on the permit.

discharge point at the City's wastewater treatment plant to a downstream diversion point. The City sought to divert an amount of water slightly less than the volume of sewage effluent it had discharged. The diverted water would be transported to a new water treatment plant, where it would be treated to drinking water standards and then returned to the City's potable water supply system. According to the City, it embarked on this reuse project "in order to facilitate the City's efforts to reduce its dependence on the Edwards Aquifer."

The water code requires that no person may appropriate or divert state water without first obtaining a permit from the Commission to make the appropriation. Tex. Water Code Ann. § 11.121 (West 2000). The City's application did not seek such an appropriation permit because, as the Commission stated when it issued notice of the City's application later that year, "all of the water to be conveyed and used is the city's private water." Thus, from the beginning, the City believed that the Commission was to have only a ministerial role in the application process; the Commission's duty would be to merely monitor the transportation of the effluent and ensure that the City diverted only its private wastewater, minus estimated losses due to evaporation and seepage.

However, after notice of the application was published pursuant to the water code, *see id*. § 11.132, a number of affected downstream property owners notified the Commission that they opposed the City's reuse project for a variety of reasons, primarily because it would reduce the flow of the river. Requesting a hearing, the Foundation opposed the assumption that the water to be diverted would be the City's private water. The Foundation's letter stated:

> [T]he city is exchanging its low quality sewage for high quality and state-owned
> water out of the San Marcos and Blanco Rivers under this permit and should not be

3

allowed. If the City wants to reuse its wastewater, it should use it directly rather than unnecessarily mixing it with the pure river water.**³**

The Commission referred the City's application to the State Office of Administrative Hearings (SOAH) for a hearing on the merits.**⁴** One of the principal issues for determination was whether the City would be diverting its private water or state water. The ALJ submitted a certified question and a recommendation for disposition to the Commission, in which it recognized that the "most crucial issue in determining the nature of the case is defining the legal character of the City's wastewater *after* it is discharged into the San Marcos River."

In response to the ALJ's certified question, the Commission issued an interim order on July 2, 1998. Because the water code did not explicitly provide for the type of permit for which the City applied, the Commission concluded that it had authority to evaluate and approve the City's application pursuant to sections 5.012 and 5.102(a) of the water code. *See id*. §§ 5.012, .102(a) (West 2000).**⁵** The Commission concluded that it possessed the authority to determine the legal

---

**³** According to a letter sent by other property owners, "[t]he seeming obvious intent now of the City is to *dilute* their own private effluent with *State* water rather than to recycle their wastewater at the treatment plant."

**⁴** Appellants in this case were designated as parties to the proceeding.

**⁵** Section 5.012 of the water code provides:

The commission is the agency of the state given primary responsibility for implementing the constitution and laws of this state relating to the conservation of natural resources and the protection of the environment.

Tex. Water Code Ann. § 5.012 (West 2000). Section 5.102(a) provides:

The commission has the powers to perform any acts whether specifically authorized by this code or other law or implied by this code or other law,

4

character of the water at issue and then determined that the City's discharged effluent remained its private groundwater. The Commission also concluded that, if the ALJ proposed that the Commission approve the City's application, the approval should contain special conditions based on factual determinations regarding historical and future discharge rates, transportation measurements, diversion rates, and other conditions designed to protect downstream water rights as well as environmental uses. Following an evidentiary hearing on remand, the ALJ submitted its Proposal for Decision ("PFD") in which it recommended that the City's application be granted, subject to appropriate conditions, "based upon the City's 'historical' discharges of effluent, to protect downstream water rights and environmental uses of the river." The Commission accepted the PFD and issued a final order granting the permit on May 11, 1999.

In its final order, the Commission made findings of fact and conclusions of law. Among other things, the Commission found:

- The City has discharged effluent at or near the present discharge point . . . for several decades, without seeking or intending to retrieve such effluent for reuse; however, the City now intends within approximately the next two years to begin recycling such effluent by diverting it into a pipeline that will be constructed across the San Marcos River at Westerfield Crossing. The pipeline will transport both the recycled effluent, as well as surface water imported from the Guadalupe River, to a raw water treatment facility that is presently under construction north of the San Marcos River.

necessary and convenient to the exercise of its jurisdiction and powers as provided by this code and other laws.

*Id.* § 5.102(a) (West 2000).

- Slightly less than one percent of the effluent discharged by the City will be lost from the bed and banks of the river during transport from the point of discharge to the point of diversion at Westerfield Crossing.

- Proper monitoring of (1) the quantity of Edwards Aquifer-derived groundwater discharged into the San Marcos River by the City; (2) the time of transport for such groundwater within the river to the point of diversion at Westerfield Crossing; (3) transportation losses of such groundwater; (4) potential measurement errors, exceeding industry and TNRCC standards, in the discharge or diversion of such groundwater; and (5) the rates at which such groundwater is discharged and diverted, collectively, will allow the City to divert volumes of water that, on a continuing basis, reasonably correspond with and are attributable to the City's prior discharges of Edwards Aquifer-derived groundwater.

- Owners of rights to use surface water in the San Marcos and Guadalupe River Basins downstream of Westerfield Crossing have relied on the historical presence in the river system of water currently discharged as effluent by the City.

The Commission also found that certain special conditions were necessary to protect downstream water rights and environmental uses. The final order adopted the legal conclusions set out in the July 2, 1998 interim order and then set out, among others, the following conclusions of law:

- [M]easuring the quantity of effluent discharged by the City during one calendar day that is attributable to Edwards Aquifer groundwater and then limiting the quantity of such groundwater that can be diverted at Westerfield Crossing during the next calendar day to 94 percent of that measured portion of discharges will assure . . . that no net quantity of state-owned water will be removed from the San Marcos River through the exercise of the City's authorization to recover the groundwater it conveys via the river.

- Limiting the City's Westerfield Crossing diversion rate to the maximum discharge rate authorized [by the Commission] will contribute to assurance that no improper diversion of state water occurs and will protect environmental uses by preventing excessive, sudden disruptions in the natural flow regime of the San Marcos River.

6

The final order also concluded that the imposition of special conditions upon the proposed diversion would be necessary to protect downstream water rights and environmental uses. The Foundation and the City sued the Commission, seeking judicial review of the final order. The district court affirmed the final order in all respects and, to the extent not subsumed by the final order, the interim order.[6] This appeal followed.

For further background purposes, it is necessary to point out that in 1997, while the City's application was pending before the SOAH, the Texas Legislature passed the comprehensive statewide water plan known as Senate Bill 1. *See* Act of June 1, 1997, 75th Leg., R.S., ch. 1010, 1997 Tex. Gen. Laws 3610 (codified throughout the Texas Water Code). It contains several key provisions on the deliverance of water down banks and beds, including one that provides for the type of reuse project developed by the City in this case:

> A person who wishes to discharge and then subsequently divert and reuse the person's existing return flows derived from privately owned groundwater must obtain prior authorization from the commission for the diversion and the reuse of these return flows. The authorization may allow for the diversion and reuse by the discharger of existing return flows, less carriage losses, and shall be subject to special conditions if necessary to protect an existing water right that was granted based on the use or availability of these return flows. Special conditions may also be provided to help maintain instream uses and freshwater inflows to bays and estuaries. A person wishing to divert and reuse future increases of return flows derived from privately owned groundwater must obtain authorization to reuse increases in return flows before the increase.

---

[6] Shortly after the Commission issued its July 2, 1998 interim order, the Foundation sought judicial review and a declaratory judgment that the Commission's conclusion as to the legal character of the effluent after being discharged was erroneous as a matter of law, in violation of the water code, and made in excess of the Commission's statutory authority. The district court took no action on this cause while the permit proceeding was still being pursued to administrative completion. This lawsuit was eventually consolidated with the lawsuits challenging the final order.

7

Tex. Water Code Ann. § 11.042(b) (West 2000).

Although it would seem that the permit granted by the Commission, with the attached special conditions, is specifically designed to track this legislative authority, all parties acknowledge that Senate Bill 1 can have no effect on the City's application because of its grandfather clause. Section 2.18(b) of the Act states that the article "does not apply to an application for an interbasin transfer *or reuse project* using privately owned groundwater received and pending before March 2, 1997. Any subsequent renewals of such applications shall be subject to the provisions of this Act." Act of June 1, 1997, 75th Leg., R.S., ch. 1010, § 2.18(b), 1997 Tex. Gen. Laws 3610, 3627 (emphasis added). The Foundation argues that there is no direct statutory authority for the City's proposed reuse project because the City applied for the permit to convey and divert in 1995, and it was still pending before the Commission as of March 2, 1997. The Commission agrees that the specific procedures prescribed by Senate Bill 1 are inapplicable to the City's application. The City also acknowledges that Senate Bill 1 does not apply to its application, and argues that as a result the Commission's imposition of the special conditions exceeded its statutory authority and violated the City's common-law rights over its captured groundwater.

## DISCUSSION

Because all parties agree that Senate Bill 1 has no bearing on whether the Commission properly granted the City's application in this case, the question for this Court is whether the Commission properly relied on pre-1997 law as its basis to grant the permit. Specifically, we must decide whether the Commission correctly concluded that the City's discharged effluent remains private groundwater that can be diverted without an appropriation permit.

8

Normally, the orders of an administrative agency are "deemed to be prima facie valid and subject to review under the substantial evidence rule." *Imperial Am. Res. Fund v. Railroad Comm'n*, 557 S.W.2d 280, 284 (Tex. 1977); *see* Tex. Gov't Code Ann. § 2001.174 (West 2000); *see also H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied). We review the Commission's findings of fact for support by substantial evidence and its legal conclusions for errors of law. Tex. Gov't Code Ann. § 2001.174[7]; *see H.G. Sledge*, 36 S.W.3d at 602. Therefore, if the Foundation's substantial rights have been prejudiced because the Commission incorrectly concluded that the City's discharged effluent remains private groundwater

---

[7] Section 2001.174(2) requires a court to reverse or remand a case for further proceedings

> if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (A)  in violation of a constitutional or statutory provision;
>
> (B)  in excess of the agency's statutory authority;
>
> (C)  made through unlawful procedure;
>
> (D)  affected by other error of law;
>
> (E)  not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
>
> (F)  arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174(2) (West 2000). Each of these grounds for reversal presents a question of law, which we review *de novo*. *See Texas Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors*, 24 S.W.3d 893, 898 (Tex. App.—Austin 2000), *rev'd on other grounds*, 92 S.W.3d 477 (Tex. 2002).

that can be diverted without an appropriation permit, we must reverse the order granting the permit to the City.

In its first issue, the Foundation attacks the validity of the permit on the grounds that "the water it authorizes the City to withdraw from the river at the diversion point is not the City's water but, instead, the state's water, to which the City has no right absent a surface water-right appropriation." The Commission and the City respond that the discharged effluent is derived from groundwater pumped, or "captured," from the Edwards Aquifer and therefore the City has the unrestricted right to transport it to its place of beneficial use by any reasonable means, including by flowing it down a state-owned water course. According to the Commission and the City, the City retains absolute ownership over the discharged effluent so long as it demonstrates an intent to reuse it and not abandon it. Because this case turns on the proper legal characterization of the City's discharged effluent, we will begin with a brief summary of pertinent principles of Texas water law.

Texas has long recognized that a landowner can assert absolute ownership over groundwater by drilling a water well and capturing it. The common-law rule of capture is based on the concept that ownership of a migratory resource occurs when one exerts control over it and reduces it to possession. *See, e.g.*, *Pierson v. Post*, 3 Cai. R. 175, 178 (N.Y. Sup. Ct. 1805) (possession of hunted wild animal established when "pursuer manifests an unequivocal intention of appropriating the animal to his individual use, has deprived him of his natural liberty, and brought him within his certain control"). The English case of *Acton v. Blundell* first enunciated a rule of capture for groundwater as follows:

10

[T]hat person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description *damnum absque injuria* [an injury without a remedy] which cannot become the ground of an action.

152 Eng. Rep. 1223, 1235 (Ex. Ch. 1843). Citing *Acton*, and specifically relying on the above passage, the Texas Supreme Court adopted the rule of capture for groundwater in *Houston & Texas Central Railway Co. v. East*, 81 S.W. 279, 280 (Tex. 1904) (refusing to recognize tort liability against railroad company when pumping of groundwater under its own property allegedly dried neighboring plaintiff's well). The only express common-law limitations on the rule were that "the owner may not maliciously take water for the sole purpose of injuring his neighbor, or wantonly and willfully waste it." *City of Corpus Christi v. City of Pleasanton*, 276 S.W.2d 798, 801 (Tex. 1955) (reaffirming rule of capture in Texas). The supreme court later recognized an exception to the rule for a landowner's negligence that proximately causes the subsidence of another's land. *See Friendswood Dev. Co. v. Smith-Southeast Indus., Inc.*, 576 S.W.2d 21, 30 (Tex. 1978).

The rule of capture for use of groundwater no longer exists in any state except Texas; because it allows a landowner to pump as much groundwater as the landowner chooses, despite the drain on an increasingly scarce resource, the retention of the rule in this state has been the subject of much comment and controversy. Nevertheless, the rule of capture has been reaffirmed by this state's supreme court as recently as 1999. In *Sipriano v. Great Spring Waters of America*, the court refused to abandon the rule of capture for the rule of reasonable use. 1 S.W.3d 75 (Tex. 1999). Although recognizing "compelling reasons for groundwater use to be regulated," the court concluded

11

that it would be "improper for courts to intercede at this time by changing the common-law framework within which the Legislature has attempted to craft regulations to meet this state's groundwater-conservation needs." *Id*. at 80.[8] Nonetheless, "the extensive statutory changes in [Senate Bill 1], together with the increasing demands on the State's water supply, may result before long in a fair, effective, and comprehensive regulation of water use that will make the rule of capture obsolete." *Id*. at 83 (Hecht, J., concurring).

Texas law categorizes surface water into one of two general types: diffuse surface water and water in a watercourse. *Domel v. City of Georgetown*, 6 S.W.3d 349, 353 (Tex. App.—Austin 1999, pet. denied). Diffuse surface water belongs to the owner of the land on which it gathers, so long as it remains on that land prior to its passage into a natural watercourse. *Id*. (citing *Turner v. Big Lake Oil Co.*, 96 S.W.2d 221, 228 (Tex. 1936)). By contrast, water in a watercourse is the property of the State, held in trust for the public. *See* Tex. Water Code Ann. § 11.021(a) (West 2000);[9] *Domel*, 6 S.W.3d at 353; *South Tex. Water Co. v. Bieri*, 247 S.W.2d 268, 272 (Tex. Civ.

---

[8] The court reasoned that there was no need for it to adopt the rule of reasonable use because in 1917, after Texas had adopted the rule of capture for groundwater, the Texas Constitution was amended to place the duty to preserve Texas's natural resources, including its groundwater, in the hands of the Texas Legislature. *Sipriano v. Great Spring Waters of Am.*, 1 S.W.3d 75, 77 (Tex. 1999) (discussing Tex. Const. art. XVI, § 59(a)). With the creation of groundwater conservation districts and the passage of Senate Bill 1, which included a renewed focus on groundwater management methods, the legislature had acted on its constitutional duty and thus it would be "more prudent to wait and see if Senate Bill 1 will have its desired effect, and to save for another day the determination of whether further revising of the common law is an appropriate prerequisite to preserve Texas's natural resources and protect property owners' interests." *Id*. at 80.

[9] Section 11.021(a) of the water code provides:

> The water of the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the

App.—Galveston 1952, writ ref'd n.r.e.); *Goldsmith & Powell v. State*, 159 S.W.2d 534, 535 (Tex. Civ. App.—Dallas 1942, writ ref'd). A watercourse has (1) a defined bank and beds, (2) a current of water, and (3) a permanent source of supply. *See Hoefs v. Short*, 273 S.W. 785, 787 (Tex. 1925). The right to use state water may be acquired by obtaining a permit from the Commission to make an appropriation. *See* Tex. Water Code Ann. §§ 11.022, .121 (West 2000). There is no statutory authority speaking directly to whether private, groundwater-derived effluent, once discharged into a watercourse, becomes part of the normal flow and thus state water subject to regulated appropriation.

The City and the Commission argue that the rule of capture clearly includes the right to convey captured groundwater down a state watercourse to the diversion point. In its interim order, the Commission concluded:

> [The City]'s discharged effluent remains private groundwater when it is discharged. *City of Corpus Christi v. City of Pleasanton*, 276 S.W.2d 798 (Tex. 1955); *Denis v. Kickapoo Land Co.*, 771 S.W.2d 235 (Tex. App.—Austin 1989, writ denied). This conclusion has two assumptions: (1) [the City]'s effluent in fact derives from private groundwater, and (2) when any particular effluent is discharged at a given time [the City] then intends to reuse the effluent.

On appeal, the Commission continues to rely on this conclusion as the basis for its decision to grant the permit to the City. The Foundation does not dispute that the effluent is derived from the City's private groundwater. But the Foundation argues that the Commission misplaces its reliance on *City*

storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state is the property of the state.

Tex. Water Code Ann. § 11.021(a) (West 2000).

13

*of Corpus Christi* and *Denis*. The Foundation also argues that the City's intent to reuse its effluent is a false assumption. We will address *City of Corpus Christi* and *Denis* in detail.

In *City of Corpus Christi*, the supreme court was called on to construe a statute that recognized the common-law right to use artesian water off the premises and to transport it in any of several enumerated ways, including by "river, creek or other natural water course or drain, superficial or underground channel, bayou, . . . sewer, street, road, [or] highway." 276 S.W.2d at 800 (quoting Tex. Rev. Civ. Stat. art. 7602 (Vernon 1925) (repealed)). The City of Corpus Christi and a landowner contracted to have the landowner furnish the city with water produced from artesian wells by flowing the wells directly into the Nueces River, which in turn flowed over one hundred miles into Lake Corpus Christi where the water was conducted to a settling basin for municipal use. *Id*. at 799-800. The plaintiffs sued on the ground that the transportation of the artesian water down a natural stream bed constituted waste because, in the process, up to seventy-four percent of the water pumped into the river escaped through evaporation, transpiration, and seepage before reaching its destination. *Id*. at 800. The plaintiffs relied on the above statute, which defined as "waste" any such transportation of water "unless it be used for the purposes and in the manner in which it may be lawfully used on the premises of the owner of such well." *Id*. Although the supreme court later stated that its discussion of the rule of capture in *City of Corpus Christi* was "incidental to the issue we decided," *Sipriano*, 1 S.W.3d at 77, the court had nonetheless recognized that there was "no common-law limitation of the means of transporting the water to the place of use." *City of Corpus Christi*, 276 S.W.2d at 802. The court in *City of Corpus Christi* thus held that it was not waste under the statute to transport water pumped from artesian wells to a settling basin by flowing it down a

14

natural stream bed and through lakes so long as the end use was lawful. *Id.* at 800, 803; *see also Sipriano*, 1 S.W.3d at 77-78 (discussing *City of Corpus Christi*).

In *Denis*, the defendant drilled into springs situated on his ranch. 771 S.W.2d at 236. The springs served as the principal source of water for Kickapoo Creek. *Id.* The defendant placed a suction pipe into the underground spring waters, captured the water before it reached the surface, measured the water, channelled it into the creek where it flowed downstream for more than a mile, and then withdrew the measured amount for irrigation purposes. *Id.* Downstream landowners filed suit pleading that the creek levels were being greatly reduced and that the defendant was unlawfully appropriating state water. *Id.*; *see* Tex. Water Code Ann. § 11.081 (West 2000). This Court held that the evidence showed that the water was percolating groundwater and, as such, was not state water if captured before reaching the surface, regardless of whether it contributed "perceptibly" to the flow of the creek. *Denis*, 771 S.W.2d at 238. Although we acknowledged that the supreme court seemed to suggest in an earlier case that the rule of capture might not apply where spring waters "added perceptibly to the general volume of water in the bed of the stream," we dismissed that statement as *obiter dicta* that was contrary to established Texas law. *Id.* (quoting *Texas Co. v. Burkett*, 296 S.W. 273, 278 (Tex. 1927)).

Having carefully considered the facts and holdings of *City of Corpus Christi* and *Denis*, we agree with the Foundation that these cases will not support the City's reuse project. In *City of Corpus Christi*, the transportation of the artesian well water was challenged as wasteful; and in *Denis*, the downstream landowners argued that the percolating groundwater was nonetheless state water because it contributed perceptibly to the flow of a creek. But in neither case was the

15

appropriation challenged on the grounds that, once discharged into a state watercourse, the groundwater became state water.[10] To the extent that the holdings in these cases compel an interpretation of the rule of capture that gives the owner of the captured groundwater the right to freely flow it down a state watercourse and then subsequently divert the water without obtaining an appropriation permit, we believe that this right must be construed narrowly.[11]

If the City in this case were immediately discharging or channeling its captured groundwater into the river after pumping it from the aquifer, and then releasing it downstream to be diverted at a point where the water would be directed to its place of beneficial use, *City of Corpus Christi* and *Denis* would likely preclude any cause of complaint by the holders of downstream riparian rights. This is because the City would specifically be exercising its right to transport its captured groundwater "to the place of use." *City of Corpus Christi*, 276 S.W.2d at 802. Here, however, it is undisputed that the City does not actually need the San Marcos River to literally transport the discharged effluent to its place of use. Nothing in the administrative record suggests that the *place* of use, or "reuse," is three miles downstream from the discharge point. Rather, once diverted downstream, the water would be transported by pipeline to a new water treatment plant,

---

[10] At least one commentator has expressed surprise with the result in *City of Corpus Christi* because "the court did not address the character of the water once it entered the Nueces River System." Kevin Smith, Comment, *Texas Municipalities' Thirst for Water: Acquisition Methods for Water Planning*, 45 Baylor L. Rev. 685, 711-12 (1993). "Arguably, diversion of groundwater into the river bed created a flowing river in an amount sufficient for irrigation and thus, the groundwater became state water subject to prior appropriation." *Id*. at 712.

[11] Again, we note that in *Sipriano*, the supreme court stated that the discussion of the rule of capture in *City of Corpus Christi* was "incidental to the issue we decided," which specifically dealt with whether flowing the water down the river constituted waste. *Sipriano*, 1 S.W.3d at 77.

16

where it would be treated to drinking water standards and then returned to the City's potable water supply system, which is in reality the "place of use."

The Commission and the City argue that there is no principled distinction between transporting captured groundwater to its place of use, and transporting groundwater-derived effluent to its place of reuse, because in both instances there is an expressed intent not to abandon the groundwater at the moment of discharge into the state watercourse. It is undisputed that, once captured and reduced to possession, the groundwater becomes the City's exclusive property, with all the rights incident to it that one might have as to any other species of property. *See Burkett*, 296 S.W. at 278. Consequently, argue the Commission and the City, the groundwater-derived effluent remains the City's property unless it expresses an intent to abandon it. *See Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 646 (Tex. 1971) ("Abandonment is the relinquishment of a right by the owner with the intention to forsake and desert it."). We disagree.

In *Domel v. City of Georgetown*, this Court held in part that because the State had a right to use a watercourse to transport water without seeking permission from downstream landowners, the City of Georgetown's discharge of treated wastewater into the watercourse did not constitute a taking of the plaintiff's property so long as pursuant to a state permit. 6 S.W.3d at 359-60. We premised our holding on the assumption that the municipality's discharged effluent, partly derived from captured groundwater, became state water upon entering the watercourse. *Id*. at 353-54. In concluding that the State's right to use a watercourse is the same whether the flow of water is "natural" or "man-made" effluent, we noted that "[o]nce return flows are given back to a watercourse, they become part of the normal flow." *Id*. at 360; *see* Tex. Water Code Ann.

17

§ 11.046(c) (West 2000); *see also Bieri*, 247 S.W.2d at 272-73 (defendant entitled to appropriate runoff water in watercourse where water originated as state water and plaintiff showed no evidence of control over runoff that had drained away; right to the water, "being merely usufructuary, depends upon possession, and that, after the water has once left the possession of the appropriator, it is lost beyond recall").

Although neither *Domel* nor *Bieri* involved a declaration of intent to retain ownership of groundwater-derived effluent after discharge, we believe that those cases are nonetheless guided by the principle that, as the Foundation succinctly states in its brief, "[i]ntent does not trump physical reality in water law." The Foundation argues that, unlike in *City of Corpus Christi* and *Denis*, where unused groundwater water was delivered downstream to a location where the owner sought to use it, the City in this case is flowing its previously-used groundwater into a river essentially for "cleaning" purposes. The administrative record is replete with expert testimony that the effluent loses its independent characteristics, separate from the state river water, by the time water is diverted three miles downstream from the discharge point. Thus, because the quality of water being diverted is better and more suitable for use than the quality of effluent at the discharge point, the City is not so much seeking to transport the effluent as it seeks to use the river as a preliminary "treatment barrier."

The Commission's final order contains findings that the diversion of water would correspond in quantity to the amount of effluent discharged, taking into account transportation losses. But the Commission did not make specific findings that could rebut the allegation that the quality of the water being diverted possessed no characteristics of sewage effluent. Nor does the

18

City attempt to deny on appeal that the primary purpose of diverting water three miles downstream from the discharge point is to divert water that is cleaner and, consequently, easier to treat than its used wastewater. It is therefore clear from the record that the City's reuse project depends on mixing its effluent with the spring-fed waters of the San Marcos River.

The Commission and the City respond that the City's manner of using the river in this case has no bearing on whether the City should be permitted to divert the approximate quantity of water that it put into the river because water is fungible. Thus, they argue that the legal character of the City's groundwater does not automatically change from private property to state-owned water upon discharge into the river. For support, they rely on this Court's opinion in *Texas Rivers Protection Association v. Texas Natural Resource Conservation Commission*, 910 S.W.2d 147 (Tex. App.—Austin 1995, writ denied). In that case, we considered, among other issues, whether the Commission erred in granting the Upper Guadalupe River Authority (UGRA) a permit to divert water from the Guadalupe River for the City of Kerrville's municipal use where the UGRA planned to store some of the water in an aquifer located below the city. *Id*. at 150-51. The plaintiffs attacked the Commission's findings that water injected into the aquifer would mix only minimally with native groundwater and thus the water injected into the aquifer will subsequently be available for beneficial municipal use. *Id*. at 154-55. We stated:

> We need not determine whether the finding of limited mixing is supported by substantial evidence because such a finding is irrelevant to the Commission's ultimate finding. Water is a fungible commodity. UGRA need not extract from the aquifer the very same water molecules that it injected into the aquifer. The relevant legal requirement is that the water be put to a beneficial use. This, in turn, requires

19

> a determination that the *quantity* of water put into the aquifer can be recovered and put to such use.

*Id*. at 155.

Although we continue to adhere to the proposition that water is a fungible commodity, the City's reuse project belies its position that its *effluent* is freely exchangeable with the water flowing in the San Marcos River. In *Texas Rivers*, the quality of water that had been diverted from the Guadalupe River and injected into the aquifer was of unquestioned quality. *See generally id.* at 150, 154-55. In contrast, at the administrative hearing the City acknowledged that its plan was not viable unless the effluent adequately mixed with the river water while flowing downstream. The Commission never found otherwise. Thus, as the Foundation aptly puts it, "[t]hat's the opposite of fungibility." Furthermore, although the effluent has been treated prior to discharge in accordance with state standards, it is undisputed that it is "municipal waste" which the water code defines as "waterborne liquid, gaseous, or solid substances that result from any discharge from a publicly owned sewer system, treatment facility, or disposal system." Tex. Water Code Ann. § 26.001(8) (West Supp. 2003). The water code's definition of "water," on the other hand, includes groundwater and surface water but makes no mention of effluent or municipal waste. *See id.* § 26.001(5). We conclude that the City's effluent is not fungible with the State's water in the San Marcos River.[12]

_____

[12] In the chapter of the administrative code pertaining to substantive water rights, the Commission's definition of "baseline or normal flow" notes that "[a]ccountable effluent discharges from municipal, industrial, irrigation or other uses of ground or surface waters may be included at times." 30 Tex. Admin. Code § 297.1(6) (West 2003); *see also Domel v. City of Georgetown*, 6 S.W.3d 349, 360 (Tex. App.—Austin 1999, pet. denied) ("Texas law recognizes treated wastewater

We agree that to abandon its ownership rights over the effluent, the City must do so voluntarily and intentionally; however, abandonment need not be proved by express declaration, but may be inferred from the surrounding circumstances. *See Raulston v. Everett*, 561 S.W.2d 635, 638 (Tex. Civ. App.—Texarkana 1978, no writ). Here, the City cannot deny that it intends to discharge its effluent into the river. The physical reality of what occurs when the City discharges sewage effluent into the San Marcos River suggests that the City is voluntarily and intentionally abandoning its ownership rights over the effluent. *See Domel*, 6 S.W.3d at 360; *Bieri*, 247 S.W.2d at 272-73. As we have explained, the design of the City's reuse project defeats the notion that the water that the City intends to divert from the river for reuse is in fact the effluent that the City put into the river at the discharge point. This is because the discharged effluent is not, in this case, fungible with the water in the river. By intentionally discharging its effluent into the river, where it eventually commingles with the State's water, the City effectively abandons its control over the identifying characteristics of its property. Thus, despite the City's declaration of intent to reuse its effluent, our conclusion that the effluent is not fungible with the river water proves that the City's discharge of *effluent* into a state watercourse constitutes abandonment as a matter of law.

---

as a valuable resource, just as naturally flowing waters are."). Thus, we do not mean to conclude that, as a matter of law, effluent can never be fungible with the waters in a watercourse. Rather, under the facts of this case, the City's effluent is not fungible with the naturally flowing waters of the San Marcos River.

Indeed, the common-law right to transport captured groundwater, as illustrated in *City of Corpus Christi* and *Denis*, must be based on the physical control of the captured property rather than on subjective intent to maintain ownership over it.[13] As the Commission itself once concluded:

> Private, percolating spring water which is allowed to enter into a watercourse and commingle with State water retains its private property characteristic only if the landowner maintains control over the spring water and can identify it both as to amount *and* location in the watercourse. In the absence of this evidence, the private spring water which has been allowed to enter a State watercourse and commingle with State water therein will be presumed to have become State water . . . .

Tex. Water Comm'n, *In the Matter of the Adjudication of the Salt Fork and Double Mountain Fork Watersheds of the Brazos I Segment in the Brazos River Basin*, (Feb. 10, 1981) (emphasis added). Thus, unless the owner of discharged effluent can identify the location of the effluent in the watercourse—and divert it before it commingles with state water—it is presumed to become state water. The Commission emphasizes that this is a rebuttable presumption. However, the

---

[13] The common law has long recognized that continued ownership rights over property acquired by capture depends on maintaining a degree of control. According to the Supreme Court of Pennsylvania:

> Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals *ferae naturae*. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner . . . . They belong to the owner of the land, are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone.

*Westmoreland & Cambria Natural Gas Co. v. DeWitt*, 18 A. 724, 725 (Pa. 1889); *cf. Pierson v. Post*, 3 Cai. R. 175, 178 (N.Y. Sup. Ct. 1805) (possession established by "certain control").

Commission does not point to any findings that explicitly rebut the presumption in this case. Rather, the Commission only found that the *amount* of the discharged effluent could be tracked and identified as it flowed down the San Marcos River to the proposed diversion point.[14] In contrast, there was no question in *City of Corpus Christi* and *Denis* that the groundwater being transported via bed and banks had not been used, was of the purest quality, and entirely fungible with the water in the respective watercourses. Taking on the function of a pipeline, the bed and banks of the watercourses in *City of Corpus Christi* and *Denis* served as an inexpensive means for the owner of the captured groundwater to maintain control over a quantity of private property during transportation. *See City of Corpus Christi*, 276 S.W.2d at 799-800; *Denis*, 771 S.W.2d at 236. Thus,

---

[14] The Commission explicitly stated in its findings that the monitoring of the effluent in the river was intended "to allow the City to divert *volumes of water* that, on a continuing basis, reasonably correspond with and are attributable to the City's prior discharges of Edwards Aquifer-derived groundwater." (Emphasis added.)

We also note that the Director of the Commission's Water Policy and Regulations Division, specifically referencing the City's application, concluded that effluent, once discharged and commingled with river water, becomes state water. He stated that "the water was not put into the stream with the initial intent to maintain control and for reuse by the City" and thus

> it is questionable whether to treat this as a "bed and banks" application as a matter of law and policy. Since reclassifying the discharged water from state water to privately-owned developed water would be inconsistent with the agency's past decisions in granting water rights on the San Marcos River . . . it is recommended it be reconsidered as an application for a new appropriation of state water.

The Commission cautions us from giving too much weight to this unofficial "opinion." *See City of Frisco v. Texas Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.) ("It is the order of the agency that is reviewed by the courts, not the recommendation of the staff."). Nonetheless, the Director's statements—especially the undisputed statements regarding past agency practice—can be considered by this Court for its evidentiary value like any other evidence. *See id.*

those cases support the narrow proposition that the bed and banks of state watercourses can be used to control captured water as an identifiable quantity of fungible property as it is transported to its place of use.

The administrative record reflects that for many years the City's discharged sewage effluent has been a source of the "ordinary flow" of the river and therefore property of the State. *See* Tex. Water Code Ann. § 11.021; *see also Domel*, 6 S.W.3d at 360. The City's attempt to now re-characterize the effluent with a declaration of intent to reuse it cannot recompense for the City's inability to control it as it mixes and becomes indistinguishable from public waters. The City initially possessed the groundwater by capture and thus the City's common-law ownership rights depend on maintaining control over that migratory resource. But the non-fungibility of the effluent with state water in this case prevents the City from controlling the legal character of the effluent after it is discharged into the San Marcos River. Thus, notwithstanding the City's stated intent not to abandon its effluent, the physical reality of the City's reuse project leads us to hold that the effluent is abandoned to the public domain once the City discharges it into the San Marcos River where it is admittedly commingled and diluted by that state watercourse. Accordingly, we sustain the Foundation's first issue.

In regard to the disposition of this appeal, we observe that it is undisputed that the findings and conclusions of the final order granting the City a permit to convey and divert water depended on the Commission's error of law. After an examination of the record as a whole, it is our view that the substantial rights of the Foundation were prejudiced because the riparian rights of its members would be affected by the City's unlawful diversion of water from the San Marcos River.

As a result, we must reverse the judgment of the district court and render judgment that the order of the Commission granting the permit be vacated. *See* Tex. Gov't Code Ann. § 2001.174; *H.G. Sledge*, 36 S.W.3d at 602.

Furthermore, we order that the City's application to convey and divert water be denied. At the time that the City filed its application, there was no explicit statutory authority on which the Commission could rely in granting the permit. Rather, the Commission implied its authority from its general powers as provided in sections 5.012 and 5.102(a) of the water code. *See* Tex. Water Code Ann. §§ 5.012, .102(a). Although the Foundation and the City both challenge the Commission's reliance on these provisions, albeit for different reasons, we reserve that question because there now exists an explicit statutory mechanism by which the Commission can grant a bed and banks permit for a reuse project using privately owned groundwater. *See id*. § 11.042(b). Thus, we believe it more prudent that, should it pursue a reuse project, the City do so within the framework of Senate Bill 1 rather than attempting to rely on an interpretation of the rule of capture as it existed before that legislative enactment. *See Sipriano*, 1 S.W.3d at 80.

## CONCLUSION

We hold that the Commission erred in its interim order by concluding that the City's effluent remains private groundwater when it is discharged into a state watercourse. The City's common-law rights over its captured groundwater, as they existed prior to the enactment of Senate Bill 1 in 1997, cannot be expanded to permit the City to discharge its effluent into the San Marcos River and then divert water downstream without having obtained an appropriative right over that state water. It is unnecessary to consider the other issues raised by the appealing parties.

Accordingly, we reverse the judgment of the district court and render judgment that the order of the Commission granting the permit be vacated and the City's application be denied.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Reversed and Rendered

Filed:   August 29, 2003