TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00390-CV






Citizens Against Landfill Location; North Alamo Water Supply Corporation;

Jimmie Steidinger; Engelman Irrigation District; and Donna Irrigation

District, Hidalgo County No. 1, Appellants


v.


Texas Commission on Environmental Quality and BFI Waste Systems

of North America, Inc., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT

NO. GN200320, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING





O P I N I O N




 Appellants, the Citizens Against Landfill Location, North Alamo Water Supply Corp.,
Jimmie Steidinger, Engelman Irrigation District, and Donna Irrigation District (collectively the
Citizens), appeal from a district court judgment affirming a final order of the Texas Natural Resource
Conservation Commission (1) granting BFI Waste Systems (BFI) a permit to vertically expand its
municipal solid-waste landfill in Hidalgo county. In issues one, two, three and six, the Citizens
assert that substantial evidence does not support the Commission's approval of the final-cover
design, post-closure bond, and closure and post-closure cost estimates; approval of the drainage plan; 
modification of the application to require the installation of two additional monitoring wells; and 
findings and conclusions that BFI had met all legal requirements with respect to its application. In
issues four and five, the Citizens argue that the Commission erred by refusing to enforce the higher
standard set forth in BFI's drainage permit, which authorized it to discharge water into the Donna
Irrigation District's system, and by concluding that BFI is authorized to capture and impound water
for irrigation and dust suppression purposes. Because we hold that the record contains substantial
evidence supporting the Commission's order and that the Commission's actions were not in error,
we affirm the district court's judgment affirming the order.


BACKGROUND


 In 1988, the Commission issued a permit that allowed BFI to construct and operate
a municipal solid-waste landfill in Hidalgo County. The landfill was to be built directly adjacent to
the local water-treatment plant. The issuance of the permit was hotly contested, and after several
years of litigation, this Court affirmed the Commission's order approving the permit. See North
Alamo Water Supply Corp. v. Texas Dep't of Health, 839 S.W.2d 448 (Tex. App.--Austin 1992, writ
denied).

 In July 1997, BFI filed an application with the Commission requesting an amendment
to its permit to allow it to vertically expand the landfill and begin accepting Class I industrial waste. 
It would also extend the remaining life of the landfill from nine years to approximately twenty years. 
The Commission declared the permit expansion application administratively complete in August
1997 and technically complete in October 1998. (2)

 Several local communities, businesses, and residents expressed opinions both for and
against the proposed expansion. (3) In response to numerous requests for a public hearing on the
matter, the Commission referred the issue to the State Office of Administrative Hearings, and a
contested-case hearing was held in April and May of 2001. After hearing testimony and reviewing
the record, the two presiding administrative law judges (ALJs) issued a proposal for decision in favor
of granting the permit to expand. After reviewing the application, the proposal for decision, and
arguments from both sides, the Commission determined that BFI's application sufficiently met all
legal requirements for the issuance of the amended permit. The Commission ordered that BFI's
application be approved with certain modifications. The only modifications applicable to this appeal
are that the final cover will include a soil erosion layer at least twelve inches deep that is capable of
sustaining native plant growth and that, within ninety days of the issuance of the permit, BFI shall
install two additional monitoring wells along the southern perimeter of the facility as specified in the
order. (4) The Citizens filed a suit for judicial review in Travis County district court. See Tex. Gov't

Code Ann. § 2001.171 (West 2000). The district court affirmed the Commission's order, and this
appeal followed.


DISCUSSION


 Judicial review of an administrative order following a contested-case proceeding is
governed by the substantial evidence rule, which provides as follows:


If the law authorizes review of a decision in a contested case under the substantial
evidence rule or if the law does not define the scope of judicial review, a court may
not substitute its judgment for the judgment of the state agency on the weight of the
evidence on questions committed to agency discretion but:


(1) may affirm the agency decision in whole or in part; and


(2) shall reverse or remand the case for further proceedings if the substantial rights
of the appellant have been prejudiced because the administrative findings,
inferences, conclusions or decisions are:


 (A) in violation of a constitutional or statutory provision;


 (B) in excess of the agency's statutory authority;


 (C) made through unlawful procedure;


 (D) affected by other error of law;


 (E) not reasonably supported by substantial evidence considering the reliable
and probative evidence in the record as a whole; or


 (F) arbitrary or capricious or characterized by abuse of discretion or clearly
unwarranted exercise of discretion.



See id. § 2001.174 (West 2000). The Citizens aver that the Commission's decision to issue BFI the
amended permit is either not supported by substantial evidence in the record, is arbitrary and
capricious, is affected by other error of law, or is in violation of a statutory provision. See id.
§ 2001.174(2)(A), (D)-(F).

 Under the substantial evidence rule we review the evidence as a whole to determine
if it is such that reasonable minds could have reached the same conclusion as the agency in the
disputed action. See H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., 36 S.W.3d 597, 602 (Tex.
App.--Austin 2000, pet. denied) (citing Texas State Bd. of Dental Exam'rs v. Sizemore, 759 S.W.2d
114, 116 (Tex. 1988)); see also Stratton v. Austin Indep. Sch. Dist., 8 S.W.3d 26, 30 (Tex.
App.--Austin 1999, no pet.). We may not substitute our judgment for that of the agency and may
only consider the record on which the agency based its decision. Tex. Gov't Code Ann. § 2001.174;
Stratton, 8 S.W.3d at 30. The issue before us is not whether the agency reached the correct
conclusion but whether there is some basis in the record for its action. See City of El Paso v. Public
Util. Comm'n, 883 S.W.2d 179, 185 (Tex. 1994); see also Texas Health Facilities Comm'n v.
Charter Med.-Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984). Although substantial evidence is more
than a mere scintilla, the evidence in the record may actually preponderate against the agency's
decision and nonetheless amount to substantial evidence. See State v. Public Util. Comm'n, 883
S.W.2d 190, 204 (Tex. 1994). We presume that the agency's findings, inferences, conclusions, and
decisions are supported by substantial evidence, and the burden to prove otherwise is on the
appellant. Charter Med., 665 S.W.2d at 453; Stratton, 8 S.W.3d at 30. Finally, the agency's
decision should be reversed only if the party challenging the decision demonstrates that the absence
of substantial evidence has prejudiced the party's substantial rights. See Locklear v. Texas Dep't of
Ins., 30 S.W.3d 595, 597 (Tex. App.--Austin 2000, no pet.).

Establishment and Maintenance of Final Cover

 The Commission's rules require that the owner or operator of a municipal solid-
waste landfill complete installation of a final-cover system to minimize infiltration and erosion
within 180 days of the last receipt of wastes. 30 Tex. Admin. Code § 330.253(b) (West 2005). The
infiltration layer must consist of a minimum of eighteen inches of earthen material overlain by a
synthetic membrane that has a permeability less than or equal to the permeability of any bottom-liner
system. Id. The erosion layer must consist of a minimum of six inches of earthen material that is
capable of sustaining native plant growth and will be seeded or sodded immediately following the
application of the final cover in order to minimize erosion. Id. § 330.253(b)(3). The specifications
for the final cover design included in BFI's application essentially trace the requirements set forth
in the Commission's rules.

 The Citizens argue that portions of the Commission's order approving (1) the final-cover design and mandating the use of an erosion layer of "at least twelve inches" and, (2) the
financial assurance bond, closure-cost estimates, and post-closure cost estimates, are not supported
by substantial evidence. The Citizens also contend that BFI's final-cover plan lacks sufficient detail
to demonstrate that BFI will successfully establish vegetation on the erosion layer because its
contents merely recite statutory performance standards. 


 Erosion Layer

 The Citizens contend that both the ALJs and the Commission concluded that BFI's
plan to use six inches of topsoil as the erosion layer was deficient because they both recommended
that BFI be required instead to install at least twelve inches of topsoil in order to obtain the permit. 
The Citizens claim that the record does not contain evidence supporting the conclusion that twelve
inches of topsoil is sufficient to establish and maintain the required vegetative cover. We disagree.

 At the application hearing, the Citizens called a series of witnesses to testify in
support of their contention that six inches of soil, as called for in BFI's application, is inadequate to
establish vegetative cover at the landfill. Dr. James Smart, a research agronomist who lives in the
Rio Grande Valley, testified that a combination of forty to fifty inches of top soil, a supplemental
irrigation system, a greater seeding rate than that provided for in the application, and a plan for
removing salt from the soil would be necessary to successfully establish and sustain vegetative cover
at the landfill. Chester Drash, a professional engineer, and Boyd Davis, a local resident who works
in the drainage and irrigation business, similarly testified that between thirty and thirty-six inches
of top soil would be necessary to establish and sustain vegetation at the site. Dr. Richard Hoverson,
a forage consultant, Esper Chandler, an agricultural consultant in the Rio Grande Valley, and Robert
Rektorik, a retired Department of Agriculture scientist, each testified that supplemental irrigation
and a drainage plan to combat salt build up would be necessary. Essentially, the Citizens argued that
the plan presented in the application was deficient because it did not provide specific details
regarding how BFI would fulfill its statutory duty of growing grass at the site.

 BFI responded by asserting that the Commission's rule sets forth a performance
standard in which the minimum requirement is stated, but ultimately if this proves insufficient to
achieve the goal of minimizing erosion by use of native plant growth, then whatever steps are
necessary to meet that goal must be followed. See id. Consequently, BFI contended that if the
specifications set forth in its application proved to be insufficient, it would still have a legal duty to
establish and sustain vegetation on the erosion layer. BFI then noted that both the application and
the site-operating plan contain several provisions that outline the commitments it has made to ensure
that the proposed erosion layer is successful. Specifically, the final-closure plan provides that the
erosion layer will consist of soil suitable for plant growth, which will be seeded and mulched as
necessary to establish vegetative cover. Additionally, the site-operating plan states that the
vegetative cover will be watered and fertilized as needed to protect the integrity of the cover, that
soil tests will be conducted to determine the exact nutrients necessary to ensure vegetative growth,
and that BFI will consult with the Hidalgo County Extension Office regarding proper fertilizer and
seed mixtures.

 BFI also provided rebuttal testimony to combat the claims of Citizens' witnesses
pertaining to the depth of soil necessary to establish vegetative cover on the erosion layer. BFI first
called Dr. Craig Benson, a professor of geological engineering at the University of Wisconsin. Dr.
Benson testified that he visited the site and observed the northern slope of the landfill that had
received intermediate cover within the last "year or so." (5) He stated that it was his understanding that
this area "was seeded, watered apparently once to get the grass growing and henceforth left to grow
on its own." He further stated that the soil depth of this area was approximately twelve to eighteen
inches. Benson collected two soil samples that he analyzed to determine the root density of the grass
at two-inch intervals throughout the sample. He testified that he found that approximately eighty
percent of the root mass was located in the upper six inches of the sample and that approximately
ninety-five percent of the root mass was located in the upper twelve inches of the sample. Based on
these findings, he concluded that the water used by the grass was practically limited to the upper
twelve inches of soil.

 Dr. Benson also testified that it was unlikely that supplemental irrigation would be
necessary. He explained this by distinguishing between growing grass as a crop and growing grass
as a tool to minimize erosion. He testified that in agricultural production the objective is to ensure
that the water content of the soil remains at a sufficiently high level so that the plant does not suffer
water stress in order to optimize yields. However, when the goal is erosion control, Dr. Benson
stated that water is only necessary to sustain vegetative life so that the plant remains in place. He
further asserted that, because the vegetation would need less irrigation, it is unlikely that excess salts
would accumulate in the soil. In addition, Dr. Benson claimed that if irrigation becomes necessary,
the rainfall that is collected and impounded in the detention channel would be adequate for the task.

 The ALJs found that the Citizens' witnesses overestimated the depth of soil that
would be required to provide cover, especially in light of Dr. Benson's analysis demonstrating that
only water in the top foot of topsoil would generally be available to the type of grass that will be
grown at the site. They observed that part of the rationale underlying the recommendations of the
Citizens' witnesses for increased topsoil was their belief that salt in irrigation water would
accumulate and need to be drained. However, the ALJs noted that the witnesses' concern was based
on the incorrect belief that BFI has no right to irrigate with the rainwater it collects in the detention
channel, which has a low salt concentration. (6) Accordingly, the ALJs accepted Dr. Benson's
assessment that the threat of salt accumulation was insignificant. The ALJs concluded that it was
conceivable that six inches of topsoil would be sufficient to comply with the Commission's rules,
but felt that there was no reason to risk the possibility that it would be inadequate. Therefore, they
proposed that BFI's application be amended to require BFI to install a soil-erosion layer at least
twelve inches deep and capable of sustaining native plant growth. The Commission adopted this
recommendation.

 Although the record contains evidence suggesting that more than twelve inches of soil
may be necessary to successfully establish and maintain vegetative growth on the final cover, the
Commission's conclusion is supported by substantial evidence. Both the ALJs and the Commission
cited Dr. Benson's root mass analysis indicating that only water located in the uppermost twelve
inches of soil would be available to the grass grown at the site in support of their conclusion that
twelve inches of topsoil is an adequate erosion layer. Furthermore, the ALJs were not persuaded by
the claims of the Citizens' witnesses that at least three feet of topsoil would be necessary to establish
and sustain vegetative cover at the site. The ALJs and the Commission were free to weigh the
conflicting evidence as they deemed appropriate, and the Commission, as the final judge of the
validity and credibility of expert testimony, may accept or reject part or all of a witness's
conclusions. See Coalition for Long Point Pres. v. Texas Comm'n on Envtl. Quality, 106 S.W.3d
363, 368 (Tex. App.--Austin 2003, pet. denied); see also Texas Water Comm'n v. Boyt Realty Co.,
10 S.W.3d 334, 343 (Tex. App.--Austin 2000, no pet.). The Commission's final order also notes
that BFI is required to "conduct any maintenance or remediation activities necessary to maintain the
integrity and effectiveness of all final cover [and] site vegetation." The order further notes that BFI's
site-operating plan sets forth specific procedures for establishing and maintaining vegetative cover. 
Even if the Citizens established that the evidence in the record preponderates against the
Commission's finding that twelve inches of topsoil constitutes an adequate erosion layer, we hold
that the record contains more than a scintilla of evidence supporting the Commission's findings and
conclusions regarding the depth of the required erosion layer. See Public Util. Comm'n, 883 S.W.2d
at 204.


 Cost Estimates

 Owners and operators of municipal solid-waste landfills are required to provide
detailed written estimates showing both the cost of hiring a third party to close the largest area of the
landfill ever requiring final closure and the cost of hiring a third party to conduct post-closure care
activities at the landfill. See 30 Tex. Admin. Code §§ 330.281, .283 (West 2005). The Citizens
claim that there is no evidence in the record supporting the approval of the closure and post-closure
cost estimates provided in BFI's application since the plans for the erosion layer do not account for
the possibility that BFI may be unable to establish vegetative cover on top of the originally proposed
six-inch erosion layer.

 BFI argues that its estimates were conservative in that they included a twenty-percent
contingency for possible cost increases. BFI also noted that the Commission's rules require that cost
estimates and the corresponding financial-assurance bonds be increased if changes in either the
closure or post-closure plan increase the costs of closing the landfill or post-closure maintenance. 
See id. §§ 330.281(a)(2), .283(a)(2).

 The ALJs found that much of the Citizens' concern regarding BFI's cost estimates
was based on their contentions that the proposed erosion layer would have to be increased from six
inches to at least three feet and that a supplemental irrigation and drainage system would be required. 
As discussed above, the ALJs disagreed that these steps would be necessary to establish and maintain
vegetation on the final cover. However, because the ALJs concluded that the thickness of the
erosion layer should be doubled from six inches to twelve inches, they recommended that the portion
of the final cover cost estimate pertaining to installation of the erosion layer be doubled. 
Furthermore, the ALJs stated that they believed their approach was supported by the record "because
the projected cost is only an estimate subject to future correction, and because it likely overstates the
cost in that it accounts for no economies of scale."

 Essentially, the Citizens contend that because BFI's final-cover design is flawed, the
cost estimates based on that design are also flawed. However, the Citizens do not point to any
specific evidence establishing that the closure and post-closure cost estimates were either
miscalculated or based on inappropriate data. Therefore, we hold that the record contains more than
a scintilla of evidence supporting the Commission's findings and conclusions regarding the closure
and post-closure cost estimates and the corresponding financial-assurance bond. See Public Util.
Comm'n, 883 S.W.2d at 204. 


 Sufficiency of BFI's Permit Application

 The Citizens contend that, because BFI's application merely recites the specific
language of the Commission's rules pertaining to the effectiveness of the erosion layer, the
Commission erroneously approved the application. BFI must include in the site-development-plan
component of the application sufficient information to document that its final-cover design will
provide effective long-term erosional stability. 30 Tex. Admin. Code § 330.55(b)(8) (West 2005). 
Additionally, BFI's application must also include the minimum information required by the
Commission regarding the final-cover plan. See id. § 330.253(d)(1)-(6). The Citizens point to BFI
Waste Systems of North America v. Martinez Environmental Group, 93 S.W.3d 570 (Tex.
App.--Austin 2002, pet. denied), in which we held an applicant's mere recitation of statutory
requirements insufficient to satisfy the applicant's burden of proving by a preponderance of the
evidence that it met each regulatory requirement. Thus, the Citizens contend that if BFI merely
tracked the Commission's regulatory requirements in its application, Martinez requires us to reverse. 
We disagree.

 The portions of the application at issue in this case are readily distinguishable from
those addressed in Martinez. In Martinez, we held that the Commission's rule governing site-
operating plans required an applicant to set forth specific, enforceable procedures governing the daily
operation of a specific landfill. (7) Martinez, 93 S.W.3d at 580. Our holding in Martinez was premised
on the fact that the Commission's rules pertaining to site operating plans consist of general
requirements that allow landfill operators to develop specific operating procedures tailored to their
individual sites. Id. Because there are no detailed rules to guide the daily operation of a landfill, we
held that requiring an applicant to provide specific, enforceable procedures was necessary to ensure
that an applicant complies with all applicable regulations and operates the site in a manner that does
not compromise health and safety. See id.

 Here, the Citizens' complaints focus on the site-development plan, specifically the
final-cover design. While there are no detailed rules governing the daily operations of a landfill,
there are specific performance standards that apply to the installation, maintenance, and overall
effectiveness of final cover. For example, a final-cover design should contain sufficient information
to demonstrate that (1) estimated peak velocities for top surfaces and embankment slopes are less
than the permissible non-erodible velocities under similar conditions; and (2) top surfaces and
embankment slopes are designed to minimize erosion and soil loss through the use of appropriate
side slopes, vegetation, and other structural and non-structural controls. 30 Tex. Admin. Code
§ 330.55(b)(8)(A)-(B). Furthermore, the Commission's final-cover rules provide performance
standards that an applicant must meet regardless of whether the application contains sufficient detail
to establish that its plan will be successful. Thus, our holding in Martinez is inapplicable to this
case.

 Moreover, the record contains substantial evidence supporting the Commission's
finding that BFI's application contained sufficient information addressing both how it would ensure
erosional stability during the life of the landfill and its procedures pertaining to the installation,
establishment, and maintenance of the erosion layer of the final-cover system. In Attachment 6 to
the site-development plan, BFI specifically provided several structural and non-structural methods
of controlling erosion--such as temporary vegetation, compacted soil stockpiles, temporary ditches,
filter fences, and gravel berms that would be employed at the site. BFI also provided information
as to how these structures should be installed and maintained. As we discussed previously, BFI's
site-operating plan contained specific details and procedures dealing with how the erosion layer
would be installed, established, and maintained. 

 We hold that the record contains substantial evidence supporting the Commission's
findings and conclusions with respect to its approval of the modified-final-cover design mandating
the use of an erosion layer of "at least twelve inches," and the financial-assurance bond, closure-cost
estimates, and post-closure cost estimates. We also hold that the Commission committed no legal
error by failing to apply Martinez to this case. We overrule the Citizens' first issue.


Surface Water Drainage

 In order to obtain the expansion permit, BFI must demonstrate in its application that
it can design, construct, and maintain a run-off management system that can collect and control at
least the water volume resulting from a 24-hour, 25-year storm. See 30 Tex. Admin. Code
§ 330.55(b)(3). The Citizens claim that under real world conditions BFI's drainage plan cannot
actually comply with this regulation. The Citizens therefore insist that the Commission's order
finding that BFI's application meets this regulatory requirement is not supported by substantial
evidence.

 At the administrative hearing, Paul Hartnett, a professional engineer and the landfill's
designer, testified that the total volume of the detention channel surrounding the landfill is 96.7 acre-feet. He testified further that the volume of run-off associated with a 24-hour, 25-year storm is 64.2
acre-feet. Thus, the detention channel has sufficient capacity to collect and control the run-off
associated with a 24-hour, 25-year storm. The Citizens were concerned that if BFI fails to establish
vegetation on the final cover, then there would be substantial erosion that would cause a build up of
sediment in the detention channel, thereby reducing its capacity. Hartnett countered this argument
by outlining the permanent and temporary controls that would be used to prevent erosion and the
build up of sediment in the channel. He stated that diversion structures, terraces, rip-rap, temporary
and permanent vegetation, silt fences, gravel berms, erosion mats, diversion ditches and other
features were incorporated into the landfill's design to prevent sediments from entering the channel. 
He further noted that BFI is required to maintain the channel, which includes removing any
sediment. 

 The Citizens further contend that BFI's practice of impounding water in the detention
channel impairs its ability to handle the required run-off. However, BFI argues that this concern is
misplaced because evidence in the record indicates that the volume of water kept in the channel will
be monitored to ensure that there is adequate remaining capacity to collect and control the run-off
from a 24-hour, 25-year storm. Both the ALJs and the Commission found that the required capacity
of the perimeter detention channel is not affected by the proposed expansion because the volume of
run-off will not materially change as a result of the proposed height increase. This finding was
confirmed by the Citizens' drainage expert, Larry Smith, who testified that the proposed vertical
expansion would not materially affect run-off volume.

 The Citizens also question BFI's ability to quickly discharge run-off collected after
a 24-hour, 25-year storm. BFI is permitted to discharge run-off into drainage ditches run by the
Donna Irrigation District. Larry Smith testified that the Donna Irrigation District's drainage ditches
are at maximum capacity after a 9.5-year storm. Smith stated that based on his calculations it would
take approximately fifteen days for the Donna ditch system to drain after a 25-year storm. Under
these conditions BFI would not be able to discharge any of the collected run-off until the ditches
completely drained or flooding would occur. Smith thus concluded that if another storm "of almost
any intensity" occurred during this time, the detention channel would overflow.

 However, the Commission's rules do not require that BFI demonstrate that its
detention channel has the capability to collect and control the run-off associated with a 24-hour, 25-year storm and the run-off from another storm occurring shortly thereafter. The Citizens' fear that
the detention channel will overflow if a 24-hour, 25-year storm is quickly followed by another storm
is based on the limitations of the Donna Irrigation District's drainage system, not BFI's detention
channel. Therefore, the fact that the detention channel may overflow under the scenario posited by
the Citizens is not evidence that BFI failed to comply with the Commission's rules. Furthermore,
the ALJs found that there was no basis to deny BFI's amended permit application based on the
limitations of the Donna Irrigation District's drainage ditches. To support this finding, the ALJs
relied on BFI's evidence indicating that (1) the vertical expansion would not generate additional run-off, (2) the current drainage system reduces run-off into the ditches to levels lower than pre-development conditions, and (3) there has been only one discharge into the drainage ditches during
the entire history of the landfill. 

 We hold that the record contains substantial evidence supporting the finding that
BFI's run-off management system complies with the Commission's rules. We overrule the Citizens'
second issue.


Groundwater Monitoring

 BFI is required to describe in its application a groundwater monitoring plan that
"consists of a sufficient number of monitoring wells, installed at appropriate locations and depths,
to yield representative groundwater samples from the uppermost aquifer" that when installed will
"ensure the detection of groundwater contamination in the uppermost aquifer." 30 Tex. Admin.
Code §§ 330.56(d)(6), .231(a), .231(a)(2) (West 2005). The design of the system shall be based on
"site-specific technical information that must include a thorough characterization of aquifer
thickness; ground-water flow rate; groundwater flow direction including seasonal and temporal
fluctuations in flow; [and] the effect of site conditions and operations on groundwater flow directions
and rates. . . ." Id. § 330.231(e)(1). The Citizens aver that because BFI's groundwater
characterization report is insufficient, the Commission's approval of the ALJ's proposed
modification, which adds two additional monitoring wells along the southern perimeter of the site,
is not supported by substantial evidence.

 At the administrative hearing, Paul Hartnett, Grant Jackson, and hydrogeologist
Michael Snyder testified that the groundwater flow in the pertinent strata is predominantly to the
north. The Citizens presented conflicting evidence that the groundwater beneath the landfill flows
south, in the direction of North Alamo's water treatment plant. The Citizens noted further that the
application concedes that flow of groundwater in the area is influenced by a variety of factors that
include the landfill itself and BFI's practice of impounding run-off in the detention channel
surrounding the site.

 The ALJs concluded that, while the predominant flow of groundwater is to the north,
the monitoring system should be capable of detecting a groundwater contamination in all directions. 
The ALJs found that this conclusion was consistent with BFI's "prudent" approach of identifying
the entire perimeter of the landfill site as the point of regulatory compliance. Even though the ALJs
found that BFI's current plan meets all regulatory requirements, they recommended including two
additional monitoring wells along the southern perimeter of the site so that the landfill's northern
and southern boundaries each have a total of five wells.

 We note that BFI is seeking a permit that would allow it to vertically expand the
landfill. The proposed expansion does not involve any land outside that currently being monitored
by a Commission-approved groundwater-monitoring system. The ALJs and the Commission found
that the current monitoring system meets all regulatory requirements. However, the Commission
and the ALJs concluded that the installation of two additional monitoring wells is an appropriate
response to the Citizens' concerns regarding the variance in groundwater flow at the site. 
Furthermore, the placement of the additional wells equidistant from the existing wells along the
southern perimeter is consistent with the current monitoring system's designation of the point of
compliance as the entire perimeter of the site.

 We hold that the record contains substantial evidence supporting the Commission's
conclusion that the modified groundwater monitoring system is sufficient. We overrule the Citizens'
third issue.


Evidentiary Issues

 Throughout the contested case hearing, the Citizens objected to the admission of
several of BFI's exhibits. In response, the ALJs denied the admission of one document. Many of
the other exhibits were admitted only for the limited purpose of showing the basis of a witness's
opinion but not for the truth of the matters contained in the exhibits. The Citizens aver that the
limitations on these exhibits rendered BFI's application incomplete. Therefore, they claim the
Commission erroneously approved BFI's application. We disagree.

 An application is deemed administratively complete when submitted to the
Commission with any required reports and fees, at which point the application becomes ready for
technical review "in accordance with the rules of the Commission." Tex. Health & Safety Code
Ann. § 361.068(a)(1)-(2) (West 2001). The Commission's rules set forth the technical requirements
for each part of the application. See 30 Tex. Admin. Code §§ 330.51-.58 (West 2005). Although
there is no statute or rule defining when an application is "technically complete," we conclude that
construing the phrase to mean that an application will be considered technically complete if it
includes information pertaining to all applicable technical requirements is consistent with the
legislature's use of the phrase in health and safety code section 361.068. See Texas Dep't of Transp.
v. Needham, 82 S.W.3d 314, 318 (Tex. 2002) (primary objective of statutory construction is to
determine and give effect to legislature's intent). If the Commission has determined that an
application is administratively and technically complete and the application then becomes the subject
of a contested case, the Commission may not subsequently revoke the determination. See Tex.
Health & Safety Code Ann. § 361.068(b)(1). Thus, the purpose of a contested-case hearing is not
to verify whether the application is administratively and technically complete, but rather to determine
whether the substance of the information provided in the application can fulfill the statutory purpose
of safeguarding the health, welfare, and physical property of the people and protecting the
environment. See id. § 361.002(a) (West 2001).

 In this case, BFI's application was determined to be administratively and technically
complete prior to the contested case hearing. Therefore, BFI was not required to establish at the
contested-case hearing that its application complied with each administrative and technical
requirement because it had already done so prior to the hearing.

 Even if BFI was required to submit evidence at the contested-case hearing
demonstrating that its application met all of the Commission's regulatory requirements, the record
contains substantial evidence supporting the Commission's finding that the application was
complete. In fact, BFI's entire application was admitted for the specific purpose of establishing what
the application contained. 

 The ALJs concluded that BFI had included all necessary information in the
application. The ALJs asserted that, while some witnesses could not independently verify particular
documents or exhibits, there was nothing in the record that cast doubt upon the information. 
Similarly, the Citizens did not introduce any contrary exhibits to demonstrate that the limited
evidence was altered or falsified. Finally, the ALJs noted that the Commission had reviewed every
part of the application and determined that it was administratively and technically complete. Thus,
the ALJs concluded that the application complied with appropriate statutes and rules. 

 We hold that substantial evidence in the record supports the Commission's finding
that BFI's application was administratively and technically complete. We overrule the Citizens'
sixth issue.


Discharge into the Donna Irrigation District's Ditches

 As discussed previously, BFI is required to demonstrate that its run-off management
system is capable of collecting and controlling the water volume resulting from a 24-hour, 25-year
storm. In order for BFI's proposed run-off management system to function as designed, BFI must
have permission to discharge excess run-off collected in its detention channel into the Donna
Irrigation District's drainage ditches. The permit BFI submitted with its expansion application was
issued as a result of the settlement agreement that terminated the litigation surrounding the
Commission's approval of the initial permit to construct and operate the landfill at issue in this case. 
As part of the settlement, BFI agreed, among other things, to design and construct its detention
channel so that it would be capable of collecting and controlling the run-off from a 100-year storm. 
 After BFI submitted its expansion application to the Commission, two of the
appellants, North Alamo Water Supply and Jimmie Steidinger, filed suit in a Hidalgo County district
court seeking a declaratory judgment and injunctive relief. North Alamo and Steidinger claimed that
BFI had breached the settlement agreement, that the proposed expansion would breach the
agreement, and that BFI had fraudulently induced them and others to enter into the agreement. (8) They
petitioned the court to declare that BFI is prohibited from operating the landfill except as allowed
in the agreement, to mandate specific performance of the agreement, and to order BFI to withdraw
its pending expansion application. They also requested injunctive relief barring BFI from
participating in further administrative proceedings regarding its proposed expansion. The district
court granted their request for injunctive relief. BFI appealed, and the injunction was dissolved. See
BFI Waste Sys. of N. Am. v. North Alamo Water Supply Corp., No. 13-99-469-CV, 2000 Tex. App.
LEXIS 1282 (Tex. App.--Corpus Christi 2000, pet. dism'd w.o.j.). (9)

 In this case, the ALJs found that, while BFI's calculations demonstrate that the
detention channel has the capacity to contain the run-off, BFI's practice of impounding water in the
channel effectively eliminates the ability to handle a 24-hour, 100-year storm. The Citizens claim
that since it is clear that BFI has not met the condition upon which its discharge permit was issued
it cannot establish that it has the authority to discharge run-off into the Donna Irrigation District's
ditches. Therefore, the Citizens argue that because the ability to discharge into these drainage
ditches is essential to BFI's run-off management system, the Commission had a duty to guarantee
that BFI had authority to do so in order to find that the system complied with its rules. They insist 
that the Commission's failure to enforce the higher standard set forth in BFI's drainage permit was
error.

 It is undisputed that the standard set forth in BFI's discharge permit exceeds the
regulatory requirement set forth by the Commission. However, the question for us is whether the
Commission possesses the authority or the duty to enforce the higher standard of the settlement
agreement. The ALJs concluded that BFI was not required to demonstrate in its application that it
could collect and control the run-off resulting from a 100-year storm. The ALJs asserted that the
Commission is obliged to follow its own rules and the standard set by the Commission for landfill
permitting is the only one that could be applied at the permit proceeding. The ALJs went on to say
that, "[e]nforcement of the settlement agreement is more appropriately left to the civil court system
that generated it." We agree with the ALJs and conclude that the Commission's authority is limited
by the scope of its own duly promulgated rules. Furthermore, the Citizens have not pointed to any
evidence in the record indicating that BFI's current discharge permit has been declared invalid. 
Therefore, we conclude that the Commission did not err by failing to enforce the higher standard and
that substantial evidence in the record supports its conclusion that BFI's run-off management system
complies with its rules. We overrule the Citizens' fourth issue.


Authority to Capture and Detain Water

 The Citizens aver that the Commission ignored BFI's failure to provide evidence of
a right to impound water in its detention channel for the purposes of dust suppression and irrigation. 
Texas Water Code section 11.021(a) provides:


The water of the ordinary flow, underflow, and tides of every flowing river, natural
stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water,
floodwater, and rainwater of every river, natural stream, canyon, ravine, depression,
and watershed in the state is the property of the state.

Tex. Water Code Ann. § 11.021(a) (West 2000). The Citizens claim that BFI's practice of
impounding water in its detention channel constitutes a wrongful diversion of state water if done
without a permit. Thus, the Citizens posit that the Commission was required to ascertain whether
BFI possessed such a permit in order to approve the application and that its failure to do so
constituted error as a matter of law. We disagree.

 Texas law categorizes surface water into one of two general types: diffuse surface
water and water in a water course. See City of San Marcos v. Texas Comm'n on Envtl. Quality, 128
S.W.3d 264, 271-72 (Tex. App.--Austin 2004, pet. denied); see also Domel v. City of Georgetown,
6 S.W.3d 349, 353 (Tex. App.--Austin 1999, pet. denied). Diffuse surface water belongs to the
owner of the land on which it gathers, so long as it remains on that land prior to its passage into a
natural watercourse. City of San Marcos, 128 S.W.3d at 272 (citing Turner v. Big Lake Oil Co., 96
S.W.2d 221, 228 (Tex. 1936)). Water in a watercourse is the property of the State. See Tex. Water
Code Ann. § 11.021(a). A watercourse has (1) a defined bank and beds, (2) a current of water, and
(3) a permanent source of supply. See Hoefs v. Short, 273 S.W. 785, 787 (Tex. 1925). The right to
use State water may be acquired by obtaining a permit from the Commission to make an
appropriation. See Tex. Water Code Ann. §§ 11.022, .121 (West 2000). 

 The record contains evidence that the detention channel is completely manmade and
is designed to capture only the surface water that originates onsite; that there is no water flow from
outside the site into the detention channel. If necessary, the detention channel is designed to be able
to discharge excess water into public drainage ditches, but we have found no evidence that BFI
diverts any water from the public drainage ditches or nearby irrigation canals. Finally, there is
testimony that the only purpose of the detention channel is to collect rainwater and not to divert the
ordinary flow from any adjacent river, stream, or water course. Thus, we find that, while it could
be argued that the detention channel has defined banks and beds, the evidence in the record is clear
that the water in the channel has no defined current and that there is no permanent supply of water
feeding the channel. Therefore, we hold that the detention channel is not a watercourse. 
Consequently, BFI may impound diffuse surface water originating at the landfill without a permit.

 We hold that the Commission did not err as a matter of law by determining that BFI
was not required to demonstrate that it possessed a permit to collect diffuse surface water in its
detention channel to be used later for dust suppression and irrigation. We overrule the Citizens' fifth
issue.


CONCLUSION


 The Commission's order approving BFI's expansion permit was supported by
substantial evidence and not in error. We affirm the district court's judgment affirming the
Commission's order.



 __________________________________________

 Bea Ann Smith, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: May 12, 2005
1. By statute effective September 1, 2001, the legislature changed the name of the Texas
Natural Resource Conservation Commission to the Texas Commission of Environmental Quality,
to be effective January 1, 2004. The statute granted the agency authority to adopt a timetable for
phasing in the change of the its name, so that until January 1, 2004, the agency was permitted to
perform any act authorized by law under either title. See Act of April 20, 2001, 77th Leg., R.S., ch.
965, § 18.01, 2001 Tex. Gen. Laws 1985, 1985. On September 1, 2002, the agency began using its
new name, while continuing to recognize the former. We will refer to the agency as the
Commission.
2. We discuss the significance of the Commission's determinations that BFI's application was
administratively and technically complete in our analysis of the Citizens' complaints regarding the
adequacy of the evidence presented at the administrative hearing.
3. The Mayors of the cities of Edcouch, Elsa, La Feria, Los Fresnos, Mercedes, Alamo, Rio
Hondo, San Juan, South Padre Island, and Weslaco; the Cameron County Commissioner; the Donna
City Manager; a County Commissioner from Hidalgo County; the President of the Rio Grande
Valley Partnership/Rio Grande Valley Chamber of Commerce; and the Executive Director of the
Weslaco Development Committee each wrote letters to the Commission expressing their support of
BFI's proposed expansion.
4. Originally, BFI's application had provided that there would be a six inch erosion layer and
that the previously approved monitoring system would be unchanged.
5. Intermediate cover is achieved by placing top soil directly on top of the waste mass. This
is done when a particular area of the landfill is not active. Additionally, Bermuda, the type of grass
that was used for intermediate cover, is the same type that BFI plans to use on the final cover.
6. Below, we discuss BFI's right to capture and use storm water run-off impounded in its
detention channel.
7. The Commission's rule governing site operating plans is found at 30 Tex. Admin. Code
§ 330.114 (West 2005). Section 330.114 states that, "The site operating plan (SOP) shall provide
operating procedures for the site management and the site operating personnel in sufficient detail to
enable them to conduct the day-to-day operations of the facility." Id.
8. North Alamo and Steidinger claimed, among other things, that BFI breached the settlement
agreement by failing to construct its detention channel so that it could collect and control the run-off
resulting from a 100-year storm.
9. There is no information in the record pertaining to the current status of North Alamo's and
Steidinger's declaratory suit.